PHILLIP C. SAMOURIS, ESQ. (Bar No. 163303)
samouris@higgslaw.com
HIGGS, FLETCHER & MACK LLP
401 West A Street, Suite 2600
San Diego, CA 92101-7913
TEL:  619.236.1551
FAX:  619.696.1410

Attorneys for Defendant and Counterclaimant
ASSET MARKETING SYSTEMS
INSURANCE SERVICES, LLC

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

THE REVOLUTION FMO LLC,
MARK LINDSEY, and TY J. YOUNG,

            Plaintiffs,

v.

ASSET MARKETING SYSTEMS
INSURANCE SERVICES, LLC,

            Defendant.

_____

ASSET MARKETING SYSTEMS
INSURANCE SERVICES, LLC,

            Counterclaimant,

v.

THE REVOLUTION FMO, LLC;
MARK LINDSEY, an individual;
TY J. YOUNG, an individual; and
HENRY JOHN WIENIEWITZ III, a.k.a.
TRAE WIENIEWITZ, an individual,

            Counterdefendants.

CASE NO. 08 CV 0929 W (AJB)

**ANSWER TO COMPLAINT BY
DEFENDANT ASSET MARKETING
SYSTEMS INSURANCE SERVICES,
LLC AND COUNTERCLAIM FOR:**

**1)  Breach of Contract;**

**2)  Misappropriation of Trade Secret;**

**3)  Copyright Infringement;**

**4)  Trademark Infringement; and**

**5)  Unfair Competition**

HIGGS, FLETCHER
& MACK LLP
ATTORNEYS AT LAW
SAN DIEGO

Defendant ASSET MARKETING SYSTEMS INSURANCE SERVICES, LLC ("AMS"), for its answer to the complaint of plaintiffs, The Revolution FMO, LLC, Mark Lindsey and Ty J. Young, filed on May 27, 2008 (the "Complaint"), states as follows:

### SUMMARY OF CLAIMS

1.      In response to paragraph 1 of the Complaint, AMS denies each and every allegation contained therein.

2.      In response to paragraph 2 of the Complaint, AMS is informed and believes that Mark Lindsey and Ty Young are the founders and principals of plaintiff The Revolution FMO, LLC ("Revolution").  AMS denies each and every remaining allegation set forth in this paragraph.

3.      In response to paragraph 3 of the Complaint, AMS denies each and every allegation set forth in this paragraph.

### JURISDICTION AND VENUE

4.      In response to paragraph 4 of the Complaint, AMS admits that jurisdiction and venue are proper in this Court, but deny the remaining allegations of this paragraph.

5.      In response to paragraph 5 of the Complaint, AMS admits that jurisdiction and venue are proper in this Court, but deny the remaining allegations of this paragraph.

6.      In response to paragraph 6 of the Complaint, AMS admits that jurisdiction and venue are proper in this Court, but deny the remaining allegations of this paragraph.

### THE PARTIES

7.      In response to paragraph 7 of the Complaint, AMS admits the allegations of this paragraph.

8.      In response to paragraph 8 of the Complaint, AMS lacks sufficient knowledge or information to form a belief as to the truth of the allegations contained therein, and on that basis denies each and every allegation contained therein.

9.      In response to paragraph 9 of the Complaint, AMS admits the allegations of this paragraph.

1      10.    In response to paragraph 10 of the Complaint, AMS admits the allegations

2 of this paragraph.

3                           **GENERAL ALLEGATIONS**

4      11.    In response to paragraph 11 of the Complaint, AMS lacks sufficient

5 knowledge or information to form a belief as to the truth of the allegations contained

6 therein, and on that basis denies each and every allegation contained therein.  AMS is

7 informed and believes that the Programs to Premium training seminars referenced in this

8 paragraph were developed, promoted, and presented by AMS, and that the bulk of the

9 written materials utilized in connection with those programs were authored by AMS

10 personnel, including Maura Lenehan and Joseph Anzalone, some of which were taken

11 from the sales processes previously created by Michael Botkin of AMS.

12      12.    In response to paragraph 12 of the Complaint, AMS refers to and

13 incorporates herein by reference its response to paragraph 11, above.

14      13.    In response to paragraph 13 of the Complaint, AMS admits that the agents

15 who license material from AMS and receive marketing support from AMS remain

16 independent and are not employees of AMS.  In that general capacity, Lindsey and Young

17 remained independent agents and were not employees of AMS.  AMS lacks sufficient

18 knowledge or information to form a belief as to the truth of the remaining allegations, and

19 on that basis denies each and every remaining allegation of this paragraph.

20      14.    In response to paragraph 14 of the Complaint, AMS admits that Lindsey,

21 Young and AMS had discussions concerning the program in February 2006, but denies

22 each and every remaining allegation of this paragraph.

23      15.    In response to paragraph 15 of the Complaint, AMS admits that Lindsey,

24 Young and AMS had discussions concerning a training program, that AMS promoted the

25 programs at its own expense and encouraged the agents with whom it had a relationship to

26 attend the programs, and that Lindsey and Young assisted AMS in presenting the

27 programs.  AMS denies each and every remaining allegation contained therein.

28

16.    In response to paragraph 16 of the Complaint, AMS admits that it paid for all marketing and other expenses for the programs.  AMS further admits that it paid a certain amount to Lindsey and Young in connection with their work on the programs which they received without complaint or further demand, until the instant dispute arose.  AMS denies each and every remaining allegation contained in this paragraph.

17.    In response to paragraph 17 of the Complaint, AMS admits that Lindsey and Young entered into a Nondisclosure Agreement with AMS on or about June 22, 2006, and that the agreement speaks for itself.  AMS denies each and every remaining allegation contained in this paragraph.

18.    In response to paragraph 18 of the Complaint, AMS admits that the Programs to Premium training seminar was repeatedly offered by AMS to the agents with whom AMS had a relationship, that AMS encouraged those agents to attend those programs, and that many of these agents did in fact attend the programs.  AMS further admits that in connection with these programs, AMS identified and promoted Lindsey and Young as trainers to the agents and producers under contract with AMS.  AMS denies each and every remaining allegation contained in this paragraph.

19.    In response to paragraph 19 of the Complaint, AMS denies that Lindsey and Young conducted the programs.  AMS paid for all marketing and other expenses related to the programs and encouraged the agents with whom it had a relationship to attend the programs.  AMS also paid a certain amount to Lindsey and Young in connection with their work on the programs which they received without complaint or further demand, until the instant dispute arose.  Lindsey and Young assisted AMS in presenting the programs.  AMS admits the remaining allegations of this paragraph.

20.    In response to paragraph 20 of the Complaint, AMS denies the allegations of this paragraph.

21.    In response to paragraph 21 of the Complaint, AMS admits that it paid Lindsey and Young approximately $162,500 each in connection with the programs.  AMS denies each and every remaining allegation of this paragraph.

22.    In response to paragraph 22 of the Complaint, AMS denies the allegations set forth in this paragraph.

23.    In response to paragraph 23 of the Complaint, AMS lacks sufficient knowledge or information form a belief as to the truth of the allegations contained therein, and on that basis denies each and every allegation contained therein.

24.    In response to paragraph 24 of the Complaint, AMS lacks sufficient knowledge or information form a belief as to the truth of the allegations contained therein, and on that basis denies each and every allegation contained therein.

25.    In response to paragraph 25 of the Complaint, AMS lacks sufficient knowledge or information form a belief as to the truth of the allegations contained therein, and on that basis denies each and every allegation contained therein.

26.    In response to paragraph 26 of the Complaint, AMS admits that the parties had some discussion regarding Lindsey and Young's plans, but denies each and every remaining allegation set forth in this paragraph.

27.    In response to paragraph 27 of the Complaint, AMS admits that the parties began negotiating the terms of a proposed relationship but that an agreement was never reached or memorialized.  AMS denies all of the remaining allegations of this paragraph.

28.    In response to paragraph 28 of the Complaint, AMS admits that the parties began negotiating the terms of a proposed relationship but that an agreement was never reached or memorialized.  AMS denies all of the remaining allegations of this paragraph.

29.    In response to paragraph 29 of the Complaint, AMS admits that the parties began negotiating the terms of a proposed relationship but that an agreement was never reached or memorialized.  AMS denies all of the remaining allegations of this paragraph.

30.    In response to paragraph 30 of the Complaint, AMS admits that the parties began negotiating the terms of a proposed relationship but that an agreement was never reached or memorialized.  AMS denies all of the remaining allegations of this paragraph.

1      31.    In response to paragraph 31 of the Complaint, AMS lacks sufficient

2  knowledge or information form a belief as to the truth of the allegations contained therein,

3  and on that basis denies each and every allegation contained therein.

4      32.    In response to paragraph 32 of the Complaint, AMS denies each and every

5  allegation in this paragraph.

6      33.    In response to paragraph 33 of the Complaint, AMS admits that it sent the

7  March 21 Letter.  AMS denies each and every remaining allegation of this paragraph,

8  including specifically the allegation that the Letter contained false, misleading or

9  defamatory information.  AMS is informed and believes and thereupon alleges that

10  Lindsey and Young were using training and sales materials which contained serious

11  violations of the Financial Industry Regulatory Authority ("FINRA") standards.

12  Moreover, pursuant to the *Advertisements of Life Insurance and Annuities Model*

13  *Regulation* drafted by the National Association of Insurance Commissioners which has

14  been adopted in a majority of states, insurers are responsible for all such advertisements

15  and related materials, regardless of who wrote them.  Thus, the March 21 Letter is

16  *privileged* pursuant to Cal. Civ. Code. §47(c).

17      34.    In response to paragraph 34 of the Complaint, AMS denies that it printed

18  and assembled ***all*** of the written materials distributed to the attendees of the Programs to

19  Premium programs.  AMS is informed and believes and thereupon alleges that Lindsey

20  and Young distributed some written materials directly to attendees without AMS'

21  involvement which contained violations of FINRA standards.  AMS' personnel asked

22  Lindsey and Young to provide a copy of these materials to AMS for compliance review

23  purposes, but Lindsey and Young refused to provide these materials.  AMS denies each

24  and every remaining allegation contained in this paragraph.

25      35.    In response to paragraph 35 of the Complaint, AMS admits that Lindsey and

26  Young requested on or about March 26, 2008, that they be released from their FMO

27  contracts with AMS, thereby severing their relationship with AMS.  AMS denies each and

28  every remaining allegation of this paragraph.

36.    In response to paragraph 36 of the Complaint, AMS lacks sufficient knowledge and information to form a belief as to the truth of the allegations contained therein, and on that basis deny each and every allegation contained therein.  AMS is informed and believes and thereupon alleges that Plaintiffs, either directly and/or through a surrogate, solicited the attendees of the P2P programs and other AMS' producers, agents and/or employees which Plaintiffs learned about and met through AMS to leave AMS and join Revolution, despite the fact that Plaintiffs duly promised to not engage in such solicitations.

37.    In response to paragraph 37 of the Complaint, AMS denies each and every allegation contained in this paragraph.

38.    In response to paragraph 38 of the Complaint, AMS denies each and every allegation contained in this paragraph.

39.    In response to paragraph 39 of the Complaint, AMS denies each and every allegation contained in this paragraph.

40.    In response to paragraph 40 of the Complaint, AMS admits that it has asserted that the Nondisclosure Agreements prohibit Plaintiffs from soliciting any producer under contract with AMS which Plaintiffs have learned about or otherwise come in contact with through the Programs to Premium program and/or confidential AMS lists and records for a period of five years after termination of the agreement.  AMS is informed and believes and thereupon alleges that this agreement is proper and enforceable under California law, including *Gordon v. Landau*, 49 Cal.2d 690, 694 (1958).  The Nondisclosure Agreements do not restrain Plaintiffs from engaging in a lawful profession, trade or business.  AMS denies each and every remaining allegation of this paragraph.

41.    In response to paragraph 41 of the Complaint, AMS lacks sufficient knowledge or information to form a belief as to the truth of the allegations contained therein, and on that basis denies each and every allegation contained therein.  The Complaint does not identify with specificity the "training materials" or copyrighted works at issue in the Complaint.  Unless and until Plaintiff specifically identifies these materials,

1  AMS cannot respond to these allegations.  Since the filing of the Complaint, Plaintiffs'

2  counsel has informed AMS' counsel that the alleged copyrighted works at issue in the

3  Complaint are the works allegedly covered under Copyright Registration Nos. **TX**

4  **0006844042, TX 0006844044**, and **TX 0006844051**.  AMS informed and believes that

5  these materials consist of three manuals, the "Basic Training", the "Boot Camp", and the

6  "Special Ops" manuals, copies of which were provided by Plaintiffs' counsel and are

7  attached hereto as **Exhibits A—C** (Bates labeled REV 0001 to REV 0103).  AMS is

8  informed and believes and thereupon alleges that the bulk of these materials were

9  authored by AMS' employees, including Maura Lenehan and Joseph Anzalone, some of

10  which were taken from the sales process previously created by Michael Botkin of AMS.

11  AMS denies all remaining allegations of this paragraph.

12      42.    In response to paragraph 42 of the Complaint, AMS admits that it registered

13  the mark "PROGRAMS TO PREMIUM" with the United States Patent and Trademark

14  Office and that it claims ownership of the mark "PROGRAMS TO PREMIUM".  AMS

15  denies each and every remaining allegation of this paragraph.

16      43.    In response to paragraph 43 of the Complaint, AMS denies each and every

17  allegation of this paragraph.

18      44.    In response to paragraph 44 of the Complaint, AMS denies each and every

19  allegation of this paragraph.

20                    **FIRST CLAIM FOR RELIEF**

21                      **(Copyright Infringement)**

22      45.    In response to paragraph 45, AMS refers to and incorporates herein by

23  reference its response to paragraphs 1 through 44, as set forth at length.

24      46.    In response to paragraph 46 of the Complaint, AMS denies each and every

25  allegation of this paragraph.

26      47.    In response to paragraph 47 of the Complaint, the Complaint does not

27  identify with specificity the alleged copyrighted works.  Based on the foregoing, AMS

28

1    lacks sufficient knowledge or information to form a belief as to the truth of the allegations

2    contained therein, and on that basis denies each and every allegation contained therein.

3        48.    In response to paragraph 48 of the Complaint, AMS lacks sufficient

4    knowledge or information to form a belief as to the truth of the allegations contained

5    therein, and on that basis denies each and every allegation contained therein.

6        49.    In response to paragraph 49 of the Complaint, AMS lacks sufficient

7    knowledge or information to form a belief as to the truth of the allegations contained

8    therein, and on that basis denies each and every allegation contained therein.

9        50.    In response to paragraph 50 of the Complaint, AMS lacks sufficient

10   knowledge or information to form a belief as to the truth of the allegations contained

11   therein, and on that basis denies each and every allegation contained therein.

12       51.    In response to paragraph 51 of the Complaint, AMS lacks sufficient

13   knowledge or information to form a belief as to the truth of the allegations contained

14   therein, and on that basis denies each and every allegation contained therein.

15       52.    In response to paragraph 52 of the Complaint, AMS lacks sufficient

16   knowledge or information to form a belief as to the truth of the allegations contained

17   therein, and on that basis denies each and every allegation contained therein.

18       53.    In response to paragraph 53 of the Complaint, AMS lacks sufficient

19   knowledge or information to form a belief as to the truth of the allegations contained

20   therein, and on that basis denies each and every allegation contained therein.

21       54.    In response to paragraph 54 of the Complaint, AMS denies each and every

22   allegation contained in this paragraph.

23       55.    In response to paragraph 55 of the Complaint, AMS denies each and every

24   allegation contained in this paragraph.

25       56.    In response to paragraph 56 of the Complaint, AMS denies each and every

26   allegation contained in this paragraph.

27       57.    In response to paragraph 57 of the Complaint, AMS denies each and every

28   allegation contained in this paragraph.

58.    In response to paragraph 58 of the Complaint, AMS denies each and every allegation contained in this paragraph.

59.    In response to paragraph 59 of the Complaint, AMS denies each and every allegation contained in this paragraph.

60.    In response to paragraph 60 of the Complaint, AMS denies each and every allegation contained in this paragraph.

61.    In response to paragraph 61 of the Complaint, AMS denies each and every allegation contained in this paragraph.

## SECOND CLAIM FOR RELIEF

### (Trademark Infringement/False Designation of Origin)

62.    In response to paragraph 62, AMS refers to and incorporates herein by reference its responses to paragraphs 1 through 61, as set forth herein.

63.    In response to paragraph 63 of the Complaint, AMS denies each and every allegation contained in this paragraph.  AMS marketed and promoted the Programs to Premium™ training seminar as its own training program.  Indeed, the Complaint repeatedly alleges as much.  Stated differently, AMS has consistently used the Programs to Premium™ mark to identify *its* seminar – a seminar that AMS promoted and presented—not Plaintiffs.  Also in connection with AMS' *Programs to Premium*™ seminars, AMS prepared training materials and, on September 1, 2006, AMS filed a trademark application with the USPTO for "*Programs to Premium"*™ in International Classes 009, 016, 035 and 041 for a variety of financial training and marketing goods and services.  The USPTO registered this trademark on May 27, 2008, Registration No. 3,436,876 (**Exhibit F**).  Based on the foregoing, the Programs to Premium™ mark belongs to AMS.  Plaintiffs have no right to use it.

64.    In response to paragraph 64 of the Complaint, AMS denies each and every allegation contained in this paragraph.

65.    In response to paragraph 65 of the Complaint, AMS denies each and every allegation contained in this paragraph.

66.     In response to paragraph 66 of the Complaint, AMS denies each and every allegation contained in this paragraph.

67.     In response to paragraph 67 of the Complaint, AMS denies each and every allegation contained in this paragraph.

68.     In response to paragraph 68 of the Complaint, AMS denies each and every allegation contained in this paragraph.

69.     In response to paragraph 69 of the Complaint, AMS denies each and every allegation contained in this paragraph.

70.     In response to paragraph 70 of the Complaint, AMS admits that it filed for and obtained a trademark registration for the Programs to Premium trademark (**Exhibit F**).  AMS denies all remaining allegation contained in this paragraph.

71.     In response to paragraph 71 of the Complaint, AMS lacks sufficient knowledge or information to admit or deny the allegations contained in this paragraph. As set-forth above, AMS is the proper and rightful owner of the mark.

72.     In response to paragraph 72 of the Complaint, AMS lacks sufficient knowledge or information to admit or deny the allegations contained in this paragraph.

73.     In response to paragraph 73 of the Complaint, AMS denies each and every allegation contained in this paragraph.

74.     In response to paragraph 74 of the Complaint, AMS denies each and every allegation contained in this paragraph.

75.     In response to paragraph 75 of the Complaint, AMS denies each and every allegation contained in this paragraph.

76.     In response to paragraph 76 of the Complaint, AMS denies each and every allegation contained in this paragraph.

# THIRD CLAIM FOR RELIEF

## (Trademark Dilution)

77. In response to paragraph 77, AMS refers to and incorporates herein by reference its responses to paragraphs 1 through 76, as set forth herein.

78. In response to paragraph 78 of the Complaint, AMS denies each and every allegation contained in this paragraph.

79. In response to paragraph 79 of the Complaint, AMS denies each and every allegation contained in this paragraph.

80. In response to paragraph 80 of the Complaint, AMS denies each and every allegation contained in this paragraph.

81. In response to paragraph 81 of the Complaint, AMS denies each and every allegation contained in this paragraph.

82. In response to paragraph 82 of the Complaint, AMS denies each and every allegation contained in this paragraph.

83. In response to paragraph 83 of the Complaint, AMS denies each and every allegation contained in this paragraph.

84. In response to paragraph 84 of the Complaint, AMS denies each and every allegation contained in this paragraph.

85. In response to paragraph 85 of the Complaint, AMS denies each and every allegation contained in this paragraph.

86. In response to paragraph 86 of the Complaint, AMS denies each and every allegation contained in this paragraph.

87. In response to paragraph 87 of the Complaint, AMS denies each and every allegation contained in this paragraph.

88. In response to paragraph 88 of the Complaint, AMS denies each and every allegation contained in this paragraph.

## FOURTH CLAIM FOR RELIEF

### (Defamation)

89.     In response to paragraph 89, AMS refers to and incorporates herein by reference its responses to paragraphs 1 through 88, as set forth herein.

90.     In response to paragraph 90 of the Complaint, AMS denies each and every allegation contained in this paragraph.

91.     In response to paragraph 91 of the Complaint, AMS denies each and every allegation contained in this paragraph.

92.     In response to paragraph 92 of the Complaint, AMS denies each and every allegation contained in this paragraph.

93.     In response to paragraph 93 of the Complaint, AMS denies each and every allegation contained in this paragraph.

94.     In response to paragraph 94 of the Complaint, AMS denies each and every allegation contained in this paragraph.

95.     In response to paragraph 95 of the Complaint, AMS denies each and every allegation contained in this paragraph.

## FIFTH CLAIM FOR RELIEF

### (Trade Libel)

96.     In response to paragraph 96, AMS refers to and incorporates herein by reference its responses to paragraphs 1 through 95, as set forth herein.

97.     In response to paragraph 97 of the Complaint, AMS denies each and every allegation contained in this paragraph.

98.     In response to paragraph 98 of the Complaint, AMS denies each and every allegation contained in this paragraph.

99.     In response to paragraph 99 of the Complaint, AMS denies each and every allegation contained in this paragraph.

100.    In response to paragraph 100 of the Complaint, AMS denies each and every allegation contained in this paragraph.

101.    In response to paragraph 101 of the Complaint, AMS denies each and every allegation contained in this paragraph.

102.    In response to paragraph 102 of the Complaint, AMS denies each and every allegation contained in this paragraph.

## SIXTH CLAIM FOR RELIEF

### (Intentional Interference With Prospective Economic Advantage)

103.    In response to paragraph 103, AMS refers to and incorporates herein by reference its responses to paragraphs 1 through 102, as set forth herein.

104.    In response to paragraph 104 of the Complaint, AMS lacks sufficient knowledge or information to form a belief as to the truth of the allegations contained therein, and on that basis AMS denies each and every allegation contained therein.

105.    In response to paragraph 105 of the Complaint, AMS denies each and every allegation contained in this paragraph.

106.    In response to paragraph 106 of the Complaint, AMS denies each and every allegation contained in this paragraph.

107.    In response to paragraph 107 of the Complaint, AMS denies each and every allegation contained in this paragraph.

108.    In response to paragraph 108 of the Complaint, AMS denies each and every allegation contained in this paragraph.

## SEVENTH CLAIM FOR RELIEF

### (Unfair Competition)

109.    In response to paragraph 109, AMS refers to and incorporates herein by reference its responses to paragraphs 1 through 108, as set forth herein.

110.    In response to paragraph 110 of the Complaint, AMS denies each and every allegation contained in this paragraph, except that AMS admits that California Business & Professions Code §17200 exists and that it speaks for itself.

111.    In response to paragraph 111 of the Complaint, AMS denies each and every allegation contained in this paragraph.

112.    In response to paragraph 112 of the Complaint, AMS denies each and every allegation contained in this paragraph.

113.    In response to paragraph 113 of the Complaint, AMS denies each and every allegation contained in this paragraph.

114.    In response to paragraph 114 of the Complaint, AMS denies each and every allegation contained in this paragraph.

115.    In response to paragraph 115 of the Complaint, AMS denies each and every allegation contained in this paragraph.

## EIGHTH CLAIM FOR RELIEF

### (Declaratory Relief)

116.    In response to paragraph 116, AMS refers to and incorporates herein by reference its responses to paragraphs 1 through 115, as set forth herein.

117.    In response to paragraph 117 of the Complaint, AMS denies the allegations contained in this paragraph, except that AMS admits that Rule 57 of the Federal Rules of Civil Procedure and 28 U.S.C. §§2201 and 2202 exist and they speak for themselves.

118.    In response to paragraph 118 of the Complaint, AMS admits the allegations contained in this paragraph, except that plaintiffs have not identified with specificity their alleged copyrighted works.

119.    In response to paragraph 119 of the Complaint, AMS admits the allegations contained in this paragraph, except that plaintiffs have not identified with specificity their alleged copyrighted works.

120.    In response to paragraph 120 of the Complaint, AMS disputes each and every allegations contained in this paragraph.  AMS refers to and incorporates herein by reference its response to paragraph 40, above, as set forth at length.

121.    In response to paragraph 121 of the Complaint, AMS admits the allegations contained in this paragraph.

122.    In response to paragraph 122 of the Complaint, AMS disputes each and every allegations contained in this paragraph.  AMS refers to and incorporates herein by reference its response to paragraph 40, above, as set forth at length.

123.    In response to paragraph 123 of the Complaint, AMS lacks sufficient knowledge or information to form a belief as to the truth of the allegations contained therein, and on that basis denies each and every allegation contained therein.

124.    In response to paragraph 124 of the Complaint, AMS lacks sufficient knowledge or information to form a belief as to the truth of the allegations contained therein, and on that basis denies each and every allegation contained therein.

125.    In response to paragraph 125 of the Complaint, AMS lacks sufficient knowledge or information to form a belief as to the truth of the allegations contained therein, and on that basis denies each and every allegation contained therein.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

#### (Failure to State a Claim)

126.    The Complaint, and each and every purported cause of action therein, fail to state facts sufficient to constitute a valid claim against AMS.

### SECOND AFFIRMATIVE DEFENSE

#### (Estoppel)

127.    Plaintiffs engaged in activities with respect to the transactions which are the subject of the Complaint, and by reason of said activities and conduct are estopped from asserting any claims for damages or seeking any other relief against AMS.  For example, and without limitation, AMS' trademark use of the words "Programs to Premium," and its copyright claims to the related material, have been open, continuous and extensive for years prior to the filing of this action, to the knowledge of Plaintiffs, with no attempt on Plaintiffs' part to obtain a judicial determination of its alleged rights.  AMS has relied to its detriment upon Plaintiffs' acquiescence and delay and have continued their use of these words as a mark and invested substantial sums in promotion and advertising of said mark

1    and creation of said material.  For these reasons, Plaintiffs are estopped to allege that any

2    act of AMS now constitutes an infringement of Plaintiffs' alleged rights.

3    <u>**THIRD AFFIRMATIVE DEFENSE**</u>

4    **(Waiver)**

5    128.    Plaintiffs have engaged in conduct and activities sufficient to constitute a

6    waiver of any alleged breach of duty, negligent act, omission or any other conduct, if any,

7    as set forth in the Complaint.

8    <u>**FOURTH AFFIRMATIVE DEFENSE**</u>

9    **(Detrimental Reliance)**

10   129.    Plaintiffs are barred by reason of the acts, omissions, representations and

11   courses of conduct of Plaintiffs, which AMS was led to rely upon to its detriment, thereby

12   barring any claims asserted by Plaintiffs under the Doctrine of Equitable Estoppel.

13   <u>**FIFTH AFFIRMATIVE DEFENSE**</u>

14   **(Laches)**

15   130.    Plaintiffs waited an unreasonable period of time before asserting their

16   claims, if any, against AMS and is thus barred from asserting such claims under the

17   Doctrine of Laches.

18   <u>**SIXTH AFFIRMATIVE DEFENSE**</u>

19   **(Complete Performance)**

20   131.    AMS has appropriately, completely and fully performed and discharged any

21   and all obligations and legal duties arising out of the matters alleged in the Complaint.

22   <u>**SEVENTH AFFIRMATIVE DEFENSE**</u>

23   **(No Damage)**

24   132.    If Plaintiffs suffered any loss, damage or injury, which is expressly denied,

25   such loss, damage or injury was not caused, either legally or proximately, by any act or

26   omission of AMS.

27

28

HIGGS, FLETCHER
& MACK LLP
ATTORNEYS AT LAW
SAN DIEGO

871764.1                          17                    Case No. 08 CV 0929 W (AJB)

## EIGHTH AFFIRMATIVE DEFENSE

### (Failure to Exercise Ordinary Care)

133.    Plaintiffs failed to exercise ordinary care, caution, and prudence to avoid the injuries, losses, or damages alleged in the Complaint and thereby directly and proximately caused and contributed to such injuries, losses, or damages.

## NINTH AFFIRMATIVE DEFENSE

### (Failure to Mitigate)

134.    Plaintiffs are barred from relief because they have failed to take reasonable and necessary steps to mitigate any alleged damages.

## TENTH AFFIRMATIVE DEFENSE

### (Comparative Fault)

135.    Plaintiffs' claims are barred, in whole or in part, by the doctrine of comparative negligence or fault.  Any and all events, happenings, injuries, and damages, if any, alleged in the Complaint were proximately caused and contributed to by the negligence, fault, and misconduct of Plaintiffs.

## ELEVENTH AFFIRMATIVE DEFENSE

### (Intervening Fault or Cause)

136.    Any alleged damages and/or injuries to Plaintiffs were either caused, in whole or in part, by parties other than AMS and over whom AMS had no control or responsibility.

## TWELFTH AFFIRMATIVE DEFENSE

### (Acceptance)

137.    Plaintiffs consented to and approved all of the acts and omissions about which Plaintiff now complains.

## THIRTEENTH AFFIRMATIVE DEFENSE

### (Consent)

138.    AMS alleges that Plaintiffs, by their acts and conduct, have consented to all conduct as alleged on the part of AMS.

## FOURTEENTH AFFIRMATIVE DEFENSE

### (Unclean Hands)

139.    AMS alleges that by virtue of the unlawful, immoral, careless, negligent and other wrongful conduct, Plaintiffs should be barred from recovery against AMS by the equitable doctrine of unclean hands.

## FIFTEENTH AFFIRMATIVE DEFENSE

### (Uncertainty)

140.    AMS alleges that the claims for relief in said Complaint, and each of them, are uncertain and ambiguous as to Plaintiffs' claim for damages against AMS.

## SIXTEENTH AFFIRMATIVE DEFENSE

### (A Claim For Punitive Damages Unconstitutional)

141.    AMS alleges that any award of punitive damages against AMS will violate their rights under the due process clauses of the California and United States Constitutions.

## SEVENTEENTH AFFIRMATIVE DEFENSE

### (Apportionment)

142.    AMS alleges that it is not responsible or liable in any way for the damages or loss alleged in the Complaint.  However, if AMS is found to be liable or responsible for any or all of the alleged damages or loss, AMS alleges that its liability, if any, is not the sole proximate cause of the damages and loss, and that the damages awarded to the Plaintiffs, if any, should be apportioned according to the respective fault and legal responsibility of all parties, persons and entities, and their agents, servants, and employees who contributed to and/or caused such damage or loss according to the proof presented at the time of trial.

## EIGHTEENTH AFFIRMATIVE DEFENSE

### (State Law Claims Preempted)

143.    Plaintiffs' state law claims are preempted by federal law.

## NINETEENTH AFFIRMATIVE DEFENSE

### (Privilege)

144.    AMS' conduct was *privileged* pursuant to Cal. Civ. Code. §47.

## TWENTIETH AFFIRMATIVE DEFENSE

### (Additional Affirmative Defenses May Be Available)

145.    AMS alleges that it currently has insufficient knowledge or information upon which to determine whether additional affirmative defenses may be available to it which have not yet been asserted in this Answer and, therefore, reserve the right to assert additional affirmative defenses based upon subsequent discovery, investigation and analysis.

## **PRAYER FOR RELIEF ON COMPLIANT**

WHEREFORE, AMS prays for judgment against plaintiffs on the Complaint as follows:

A.    That plaintiffs take nothing against AMS;

B.    That the Court enter a judicial declaration as follows: (1) AMS is the exclusive owner of all rights in the "*Programs to Premium*"™ trademark and that Plaintiffs have no trademark rights in those words; (2) plaintiffs are not entitled to ownership of the materials attached hereto as **Exhibit A—C**; (3) plaintiffs are required to transfer their copyright registrations of these materials, if any, to AMS; (4) paragraph 3 of the Nondisclosure Agreements is valid and enforceable under California law; (5) plaintiffs' solicitation of AMS' agents whom plaintiffs learned about through AMS' *Programs to Premium*™ training seminars and use of AMS' trade secrets in competition with AMS should be and is enjoined, either by an issuance of an injunction or otherwise; and (6) plaintiffs solicitation of AMS' agents whom plaintiffs learned about through AMS' *Programs to Premium*™ training seminars, or other use of AMS' trade secret information in competition with AMS constitutes a breach of the Nondisclosure Agreements, and otherwise violates legitimate rights of AMS;

C.    For attorney fees and costs of suit herein incurred; and

D.    For such other and further relief against plaintiff as the Court may deem just and proper.

## COUNTERCLAIM

Defendant and counterclaimant, Asset Marketing Systems Insurance Services, LLC (hereinafter "AMS"), for its counterclaims for relief against plaintiffs and counterdefendants, The Revolution FMO, LLC, Mark Lindsey, and Ty J. Young, and its counterclaims against counterdefendant Henry John Wieniewitz III, a.k.a. Trae Wieniewitz ("Weiniewitz"), respectfully alleges as follows:

### I.

### PARTIES

1.    AMS is a Delaware limited liability company having its principal place of business in San Diego, California, within this judicial district.

2.    AMS is informed and believes, and thereon alleges, that plaintiff and counterdefendant The Revolution FMO, LLC ("Revolution"), is a California limited liability company with its principle place of business at 22736 Vanowen Street, Ste. 300, West Hills, CA 91307.

3.    AMS is informed and believes, and based thereon alleges, that plaintiff and counterdefendant Mark Lindsey ("Lindsey") is an individual residing in California and doing business as an insurance agent at 22736 Vanowen Street, Ste. 300, West Hills, CA 91307, and is a founder and principal of Revolution.

4.    AMS is informed and believes, and based thereon alleges, that plaintiff and counterdefendant Ty J. Young ("Young") is an individual residing in Georgia and doing business as an insurance agent at 100 Galleria Parkway NW, Ste. 1050, Atlanta, GA 30339, and is a founder and principal of Revolution.

5.    AMS is informed and believes, and based thereon alleges, that counterdefendant Wieniewitz is an individual residing in Tennessee and doing business as an insurance agent at 9050 Executive Park Drive, Financial Plaza, Ste. 106A, Knoxville, TN 37923, and at all relevant times mentioned herein was acting as an agent for and on behalf of Revolution, Lindsey and Young, as well as for his own benefit.

## II.

### JURISDICTION AND VENUE AS AGAINST PLAINTIFFS AND COUNTERDEFENDANTS, REVOLUTION, LINDSEY AND YOUNG

6.     This Counterclaim is for copyright infringement arising under the Copyright Act of 1976, 17 U.S.C. §§ 101, et seq., and for trademark infringement arising under the Lanham Act, 15 U.S.C. §§ 1051, et seq., and related claims of unfair competition against defendants.  This Court has jurisdiction of this action under 28 U.S.C. §§ 1331, 1338(a) and 1338(b), and this Court's pendent jurisdiction.  This Court has supplemental jurisdiction over the state claims pursuant to 28 U.S.C. §1367.

7.     Personal jurisdiction and venue are proper in this judicial district under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims asserted herein occurred in this judicial district, in particular, the agreements at issue between the parties were executed and delivered within the County of San Diego.  Moreover, the parties have agreed that any dispute arising under their agreements shall be resolved solely in a court of competent jurisdiction located in the County of San Diego.  Thus, each party has submitted to the jurisdiction and venue of this Court.

## III.

### JURISDICTION AND VENUE AS TO COUNTERDEFENDANT WIENIEWITZ

8.     This counterclaim against Wieniewitz arises out of the same common nucleus of operative facts which are at issue in the counterclaims against plaintiffs (Revolution, Lindsey, and Young), such that this Court has supplemental jurisdiction over the counterclaim against Wieniewitz.  As set forth below, AMS alleges that plaintiffs Revolution, Lindsey, and Young have entered into Nondisclosure Agreements with AMS which prohibit them from soliciting insurance agents under contract with AMS which plaintiffs have learned about or otherwise come in contact with through AMS' Programs to Premium training programs and/or AMS' lists and records for a period of five years after termination of the parties relationship.  Despite these promises, AMS is informed

HIGGS, FLETCHER
& MACK LLP
ATTORNEYS AT LAW
SAN DIEGO

and believes and thereupon alleges that plaintiffs have improperly solicited such agents both directly and indirectly, through Wieniewitz, in breach of their contractual obligations to AMS.  AMS further alleges that Wieniewitz has also entered into an agreement with AMS which prohibits Wieniewitz from soliciting insurance agents under contract with AMS which Wieniewitz has learned about or otherwise come in contact with through AMS and/or AMS' confidential lists and records.  Thus, AMS' claims against Wieniewitz arise out of the same common nucleus of operative facts which are at issue in the counterclaims against plaintiffs, such that this Court has supplemental jurisdiction over AMS' claims against Wieniewitz pursuant to 28 U.S.C. §1367.

9.    Personal jurisdiction and venue are proper in this judicial district with respect to the claims against Wieniewitz under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims asserted herein occurred in this judicial district, in particular, the agreements at issue between the parties were executed and delivered within the County of San Diego.  Moreover, the parties have agreed that any dispute arising under their agreements shall be resolved solely in a court of competent jurisdiction located in the County of San Diego.  Thus, each party has submitted to the jurisdiction and venue of this Court.

**IV.**

**FACTS COMMON TO ALL CLAIMS FOR RELIEF**

10.    AMS is a field marketing organization ("FMO") which provides marketing support and training to independent insurance agents throughout the United States.  To that end, AMS creates, among other things, seminar-based programs to generate leads for sale of insurance products, including invitations to attract people to the programs, scripts for the programs, and outlines and other material to be distributed at the programs.  AMS continually updates its programs and creates new programs for various segments of the public and provides training to the agents.  AMS incurs great expense and time to create, modify, implement, test and train its programs and related marketing solutions.

11.     AMS licenses its programs to insurance professionals throughout the country (the "System Subscribers").  AMS receives a commission override from the sale of Insurance Products made by the System Subscribers and other agents under contract with AMS.  AMS extensively markets its products and services to independent insurance agents through advertisements in national publications, through its Internet site at www.assetmarketingsystems.com, and through telephone solicitations and associated recruiting efforts.  ***AMS incurs great expense and time to recruit qualified, independent agents to contract with AMS***.

12.     The identity of AMS' contracted producers and AMS' records and lists with respect to those individuals has independent economic value from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use, especially competing field marketing organizations or FMOs.  In light of the foregoing, AMS undertakes efforts that are reasonable under the circumstances to maintain the secrecy of the identity and contact information of AMS' contracted producers and its records related to those producers, including, without limitation, requiring System Subscribers and others to sign nondisclosure agreements, by which they agree that AMS' list of contracted agents is proprietary and confidential to AMS, and that they further agree not to solicit those producers on behalf of a competing FMO.

13.     In December 2003, AMS conceived and developed a program entitled TEN SMART IDEAS™ to guide and assist salespersons in their efforts to identify and meet persons who may have interest in or need for life, annuity and long-term products ("Insurance Products") including, but not limited to, a copyrighted invitation and workbook and related handout (collectively referred to herein as the "TEN SMART IDEAS™ System").

14.     On January 25, 2005, AMS filed a trademark application with the United States Patent and Trademark Office ("USPTO") for "SMART IDEAS FOR A SLIGHTLY CRAZY WORLD"™ in International Classes 009, 016, 035, 036 and 041 for a variety of financial training and marketing goods and services, U.S. Trademark

1    Application Serial No. 78-553410.  The USPTO registered this trademark on July 31,

2    2007, Registration No. 3,272,831.

3        15.    On July 26, 2006, AMS filed a trademark application with the USPTO for

4    "SMART IDEAS"™ in International Classes 009, 016, 035, 036 and 041 for a variety of

5    financial training and marketing goods and services, U.S. Trademark Application Serial

6    No. 78-938384.  The USPTO registered this trademark on January 15, 2008, Registration

7    No. 3,370,855.

8                                          **V.**

9                          **LINDSEY AND YOUNG**

10       16.    Lindsey and Young were System Subscribers of AMS.  As a result of AMS'

11   training and guidance, the insurance sales revenue of Lindsey and Young increased

12   greatly from the time they initially contracted with AMS.

13       17.    On or about February of 2006, Lindsey, Young and AMS began to discuss

14   an arrangement whereby Lindsey and Young would help train other agents under contract

15   with AMS.  Although the parties discussed this arrangement and exchanged draft

16   agreements, no agreement was ever finalized or memorialized.  Even so, AMS developed,

17   promoted and offered training seminars to its contracted producers entitled *Programs to*

18   *Premium*™ from about September 2006 to February 2008, during which Lindsey and

19   Young provided training.  AMS promoted the programs at its own expense and

20   encouraged its qualified, contracted agents to attend the programs.  Lindsey and Young

21   assisted AMS in presenting the programs.  AMS paid **$162,500** to Lindsey and **$162,500**

22   to Young in connection with their work on the programs which they received without

23   complaint or further demand.

24       18.    In AMS' efforts to advertise its *Programs to Premium*™ seminars, AMS

25   identified and promoted Lindsey and Young as experts and successful insurance agents to

26   AMS contracted agents, thereby promoting the image and reputation of Lindsey and

27   Young in the eyes of the AMS' network of agents.  Before AMS engaged in this activity,

28   Lindsey and Young repeatedly assured AMS that they would not use this opportunity to

solicit AMS' contracted agents to join a competing FMO or otherwise use the opportunity to compete against AMS.  To that end, both Lindsey and Young signed a "Nondisclosure Agreement" wherein they agreed that AMS' list of agents, clients, employees and others with whom AMS does, or has done, business with is proprietary confidential information to AMS, and further promising that during the term of the agreement, and for five years after termination of the agreement, that Lindsey and Young would not directly or indirectly solicit, divert or take away AMS' contracted agents for themselves or on behalf of a competitor of AMS.  True and correct copies of the Nondisclosure Agreements signed by Lindsey and Young are attached hereto as **Exhibits D** and **E**.

19.     Also in connection with AMS' *Programs to Premium*™ seminars, AMS prepared training materials and, on September 1, 2006, AMS filed a trademark application with the USPTO for "*Programs to Premium"*™ in International Classes 009, 016, 035 and 041 for a variety of financial training and marketing goods and services.  The USPTO registered this trademark on May 27, 2008, Registration No. 3,436,876 (**Exhibit F**).

20.     On or about February 2008, Lindsey and Young notified AMS that they intended to create a competing FMO (Revolution).  Although the parties discussed and negotiated various terms whereby the parties would continue to cooperate with each other in some manner, the parties were unable to reach an agreement in this regard.

21.     On or about March 26, 2008, Lindsey and Young demanded that AMS terminate the parties' contracts.  AMS is informed and believes, and based thereon alleges, that shortly before Lindsey and Young terminated the relationship, they began to directly and indirectly solicit AMS' contracted agents and employees to leave AMS and join their newly formed FMO, Revolution, in direct violation of their representations to AMS and their Nondisclosure Agreements.

22.     AMS is informed and believes, and based thereon alleges, that Lindsey and Young, through their newly formed FMO, Revolution, have offered, and continue to offer, monetary incentives to their affiliated insurance agents to recruit AMS' contracted agents to Revolution.  As a result, AMS is informed and believes, and based thereon alleges, that

1  Wieniewitz, acting on behalf of Lindsey, Young and Revolution, has directly solicited,

2  and will continue to directly solicit, AMS' contracted agents (including the same qualified

3  agents who had participated in AMS' *Programs to Premium*™ training seminars) to leave

4  AMS and join Lindsey and Young's new FMO, Revolution, all with the knowledge,

5  consent and assistance of Lindsey and Young.

6      23.    AMS is informed and believes, and based thereon alleges, that Lindsey and

7  Young, through their newly formed FMO, Revolution, have used, and continue to use,

8  testimonials that were supposedly given by AMS' System Subscribers who had

9  participated in AMS' *Programs to Premium*™ training seminars, to market and promote

10  Lindsey and Young's new FMO, Revolution, in violation of their representations to AMS

11  and their Nondisclosure Agreements.

12      24.    AMS is informed and believes, and based thereon alleges, that Lindsey

13  continued to use AMS' copyrighted marketing material as well as the TEN SMART

14  IDEAS™ trademark, thereby infringing AMS' trademark and copyright.

15                                   **VI.**

16                          **FIRST CLAIM FOR RELIEF**

17                            **(Breach of Contract)**

18      25.    AMS realleges and incorporates herein by reference the obligations in

19  Paragraphs 1 through 24, as set forth herein.

20      26.    AMS is informed and believes, and based thereon alleges, that Lindsey and

21  Young have breached the terms of their Nondisclosure Agreements by directly and

22  indirectly soliciting AMS' System Subscribers and employees to leave AMS and join their

23  newly created FMO, Revolution.

24      27.    Lindsey also entered into a licensing agreement with AMS, whereby AMS

25  granted Lindsey permission to utilize AMS' TEN SMART IDEAS™ System, including

26  invitations and marketing material, as well as the TEN SMART IDEAS™ trademark.

27  That agreement was terminated on or about March 26, 2008.  Thereafter, Lindsey had no

28  further right to use any of AMS' materials.  Despite the foregoing, AMS is informed and

1    believes, and based thereon alleges, that Lindsey continued to use and/or copy AMS'

2    marketing materials and continued to use the TEN SMART IDEAS™ mark (the "Mark"),

3    in breach of the terms of the licensing agreement.

4         28.    AMS is informed and believes, and based thereon alleges, that Wieniewitz

5    has breached the Agent Nondisclosure Agreement dated July 22, 2005, which was duly

6    entered into by AMS and Wieniewitz, a copy of which is attached hereto as **Exhibit G**, by

7    soliciting and continuing to solicit AMS' System Subscribers and by otherwise using

8    confidential information provided by AMS to improperly solicit AMS' System

9    Subscribers to leave AMS and join Revolution.  AMS is informed and believes and

10    thereupon alleges that Wieniewitz engaged in this improper activity at the behest and for

11    the benefit of Lindsey, Young and/or Revolution.

12         29.    AMS has fulfilled all of its obligations under the agreements identified

13    above.  To the extent AMS has not fulfilled any obligations under those agreements,

14    AMS' performance was duly excused or waived by the conduct of counterdefendants.

15         30.    As a proximate result of these breaches of contract, AMS has suffered, and

16    will continue to suffer, actual damages in a sum to be proven at trial.  As a further

17    proximate result of these breaches of contract described above, counterdefendants have

18    been or will be unjustly enriched.

19         31.    AMS alleges that unless and until enjoined and restrained by order of this

20    Court, counterdefendants will continue to breach the contracts, causing great and

21    irreparable injury to AMS' business, and will allow counterdefendants to gain a

22    commercial advantage over AMS.

23         32.    AMS has no adequate remedy at law for the injuries being suffered and

24    which may continue in the future.  Counterdefendants will continue to breach the contract

25    at issue, and AMS, thus, will be required to maintain a multiplicity of judicial proceedings

26    to protect its interests.

27

28

# VII.

## SECOND CLAIM FOR RELIEF

### (Misappropriation of Trade Secret)
### (Cal. Civ. Code §§ 3426, et seq.)

33.    AMS realleges and incorporates herein by reference the allegations in Paragraphs 1 through 32, as set forth herein.

34.    As set forth above, the identity of AMS' contracted producers and AMS' records and lists with respect to those individuals has independent economic value from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use, especially competing FMOs.  In light of the foregoing, AMS undertakes efforts that are reasonable under the circumstances to maintain the secrecy of the identity and contact information of AMS' contracted producers and its records related to those producers, including, without limitation, requiring System Subscribers and others to sign nondisclosure agreements, by which they agree that AMS' list of contracted agents is proprietary and confidential to AMS, and that they further agree not to solicit those producers on behalf of a competing FMO.  Based on the foregoing, this information constitutes a trade secret under California law.

35.    Lindsey, Young, and Wieniewitz have misappropriated this trade secret by using it to solicit AMS' contracted producers for the benefit of Revolution, and to the detriment of AMS, despite the fact that each of them have promised to not use this confidential information to aid in soliciting AMS' producers.

36.    AMS is informed and believes and thereupon alleges that Revolution has misappropriated this trade secret by using this confidential information without AMS' express or implied consent, and that at the time of using this trade secret information, Revolution knew or had reason to know that its knowledge of the trade secret was derived from or through persons (Lindsey, Young and/or Wieniewitz) who owed a duty to AMS to maintain the secrecy or otherwise limit the use of the information.

37. As a proximate result of the use by counterdefendants of AMS' confidential information, trade secrets, and agent lists, AMS will suffer actual damages in a sum to be proven at trial. As a further proximate result of the actual and/or threatened misappropriation described above, counterdefendants have been or will be unjustly enriched by wrongfully obtaining business that would have otherwise been retained by AMS.

38. AMS is informed and believes and thereupon alleges that the aforementioned acts and conduct of counterdefendants were willful, oppressive and malicious and that counterdefendants misappropriated AMS' confidential information, trade secrets, and agent lists with the intent to injure AMS' business and improve their own. AMS is, therefore, entitled to punitive and exemplary damages, as provided under California law.

39. AMS alleges that unless and until enjoined and restrained by order of this Court, counterdefendants' misappropriation of AMS confidential and proprietary information and wrongful use of substantive information will continue, causing great and irreparable injury to AMS' business, and will allow counterdefendants to gain a commercial advantage over AMS.

40. AMS has no adequate remedy at law for the injuries being suffered and which may continue in the future. Counterdefendants will continue to misappropriate and wrongfully and unlawfully utilize AMS' confidential information, trade secrets, and agent lists, and AMS, thus, will be required to maintain a multiplicity of judicial proceedings to protect its interests.

41. As a result of counterdefendants' misappropriation of AMS' confidential information, trade secrets, and agent lists, AMS has been forced to retain the law firm of Higgs, Fletcher & Mack LLP to represent its interests and preserve and protect it confidential information, trade secrets, and agent lists. Accordingly, AMS is entitled to payment of reasonable attorneys' fees and costs of suit incurred herein pursuant to Civil Code §§ 1717 and 3426.4, as well as the terms of the parties' agreements.

## VIII.

## <u>THIRD CLAIM FOR RELIEF</u>

### (COPYRIGHT INFRINGEMENT)
### (17 U.S.C. § 501)

42.    AMS realleges and incorporates herein by reference the allegations in paragraphs 1 through 41, as set forth herein.

43.    AMS is the author and exclusive owner of the TEN SMART IDEAS™ System, including copyrighted program invitations.

44.    AMS holds a valid United States copyright in the program invitations.

45.    AMS has complied in all respects with the provisions of the Copyright Act and filed applications to register the program invitations with the United States Copyright Office.

46.    AMS duly revoked its licensing agreement with Lindsey, whereby Lindsey was permitted to use the program invitation.

47.    Despite the foregoing, AMS is informed and believes and that basis alleges that Lindsey has copied, distributed, and made use of and continues to make use of the program invitation (or substantially similar materials) as well as other TEN SMART IDEAS™ program materials in connection with Lindsey's business, without the consent or permission of AMS.

48.    AMS is informed and believes, and on that basis alleges, that Lindsey has copied and made use of and continues to make use of both the individual protectable expressive elements of the TEN SMART IDEAS™ System and the expressive manner in which AMS selected, arranged and combined the protectable and non-protectable elements of the works.

49.    Lindsey unquestionably had access to the program material by virtue of Lindsey's prior relationship with AMS—conducting seminars using the TEN SMART IDEAS™ material under license from AMS.

HIGGS, FLETCHER
& MACK LLP
ATTORNEYS AT LAW
SAN DIEGO

1    50.    Lindsey's past and current use of the works and other TEN SMART

2    IDEAS™ program materials (or substantially similar materials) constitutes copyright

3    infringement in violation of 17 U.S.C. § 501(a).

4    51.    AMS is informed and believes, and on that basis alleges, that Lindsey has

5    derived and continues to derive benefits, financial and otherwise, from its unauthorized

6    use of the works and other TEN SMART IDEAS™ program materials.

7    52.    AMS is informed and believes, and on that basis alleges, that at all relevant

8    times, Lindsey has engaged and continues to engage in the business of knowingly and

9    systematically participating in, facilitating, materially contributing to, and encouraging the

10    above-described, unauthorized production and distribution of the works.

11    53.    The foregoing acts of infringement by Lindsey were willful, intentional, and

12    purposeful, in disregard of and with indifference to AMS' rights.

13    54.    As a direct and proximate result of Lindsey's infringement of AMS'

14    copyright, and exclusive rights under copyright, AMS is entitled to recover Lindsey's

15    profits made from his wrongful acts pursuant to 17 U.S.C. § 504 along with any and all

16    profits lost by AMS due to Lindsey's conduct.

17    55.    Alternatively, AMS is entitled to the maximum statutory damages, pursuant

18    to 17 U.S.C. § 504 for Lindsey's willful infringement or for such other amounts as may be

19    proper to 17 U.S.C. §§ 504 and 505.

20    56.    Lindsey's conduct is continuing and constitutes an ongoing threat to AMS.

21    Unless Lindsey is restrained and enjoined from engaging in the infringing conduct

22    described herein, AMS will suffer irreparable injury.

23    57.    AMS is entitled to impoundment and destruction of Lindsey's infringing

24    materials pursuant to 17 U.S.C. § 503.

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# IX.

## FOURTH CLAIM FOR RELIEF

### (TRADEMARK INFRINGEMENT)
### (15 U.S.C. § 1125(a))

58.    AMS realleges and incorporates herein by reference the allegations in paragraphs 1 through 57, as set forth herein.

59.    Since 2006, AMS has extensively and continually used the mark TEN SMART IDEAS™ or SMART IDEAS™ in conducting the TEN SMART IDEAS™ System and the TEN SMART IDEAS™ sales programs.

60.    AMS owns valuable rights, and has developed significant goodwill, in its name and mark TEN SMART IDEAS™ or SMART IDEAS™ (hereinafter, the "Mark").

61.    AMS is the exclusive owner and senior user of the Mark in connection with the provision of training programs and other services to producers and agents in the insurance industry.  As set forth above, AMS obtained a trademark registration from the USPTO for the Mark.  Moreover, beginning on a date prior to Lindsey's activities complained of herein, AMS' Mark became distinctive and acquired a secondary meaning within the insurance industry community.  The Mark is understood by the insurance industry community to be authorized, licensed, affiliated with, and/or endorsed by AMS.

62.    Without the permission or consent of AMS, and long after AMS had established valuable goodwill in connection with their training and services identified by the Mark, Lindsey commenced to use, in interstate commerce and commerce substantially affecting interstate commerce, the Mark, in connection with its competing business and services in the insurance industry.

63.    AMS is informed and believes and thereupon alleges that Lindsey utilized the Mark "TEN SMART IDEAS™" in its marketing materials after AMS had terminated its licensing agreement regarding the use of the Mark with Lindsey.  Lindsey's use of "TEN SMART IDEAS™" is colorable imitation and confusingly similar to AMS' Mark.

64.     In selecting and using the Mark "TEN SMART IDEAS™" as a service mark, Lindsey is acting with the purpose of taking the benefit of the favorable reputation and valuable goodwill which AMS has established in their servicemark, and causing the services and business of Lindsey to be pawned off as made, authorized, sponsored by, endorsed by or otherwise connected with AMS.

65.     Lindsey's activities complained of herein are likely to cause confusion, to cause mistake and to deceive members of the insurance industry community as to the source, nature and quality of the program and services marketed by Lindsey.

66.     Lindsey has intentionally and wrongfully infringed the Mark through adoption and use of the confusingly similar name and mark "TEN SMART IDEAS™" in providing services in direct competition with such services of AMS.  Lindsey's actions constitute willful violation of the Lanham Act, including but not limited to Sections 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

67.     Accordingly, AMS is entitled to recover Lindsey's profits and reasonable royalties together with AMS' damages, each of which may be trebled, as well as the cost of action and reasonable attorneys' fees pursuant to Section 35(a) of the Lanham Act, 15 U.S.C. § 1117.

68.     Lindsey's intentional and willful activities have caused, and will continue to cause, irreparable harm to AMS for which AMS have no adequate remedy at law, in that: (i) the Mark is a unique and valuable property right of AMS and its market value cannot readily be determined; (ii) Lindsey's infringement constitutes an interference with AMS' goodwill and business and will substantially harm AMS' reputation; and (iii) Lindsey's wrongful conduct, and the damages resulting to AMS, are continuing.  Accordingly, AMS is entitled to a preliminary and permanent injunctive relief.

69.     AMS is informed and believes, and on that basis alleges, that Lindsey's conduct as alleged herein was intentional and malicious.  AMS therefore is entitled to an award of punitive damages against Lindsey, in an amount sufficient to discourage and deter such conduct in the future, and to make an example of Lindsey.

# X.

## FIFTH CLAIM FOR RELIEF

### (UNFAIR COMPETITION)
### (CAL. BUS. & PROF. CODE §17200 AND CALIFORNIA COMMON LAW)

70.    AMS realleges and incorporates herein by reference the allegations in paragraphs 1 through 69, as set forth herein.

71.    California Business & Professions Code §17200 forbids unfair competition, which is defined as "any unlawful, unfair or fraudulent business act or practice."

72.    Lindsey's acts have impaired AMS' goodwill, and have created a likelihood of confusion and have otherwise adversely affected AMS' business and reputation by use of unlawful and unfair business practices.  Lindsey's conduct also violates federal statutory law, as set forth herein.  These acts constitute unfair competition and unfair business practices under California Business & Professions Code §17200 and California Common Law.

73.    AMS has suffered injury in fact and has lost money or property as a result of Lindsey's acts of unfair competition.

74.    By reason of his actions, Lindsey is required to make restitution to AMS in a sum to be proven at trial.  Upon information and belief, Lindsey also has wrongfully profited and has wrongfully been enriched by his acts of unfair competition and should be required to disgorge any and all ill-gotten profits.

75.    Absent injunctive relief, AMS has no means by which to control Lindsey's deceptive and confusing use of AMS' copyrights and trademark.  AMS is thus entitled to injunctive relief prohibiting Lindsey from continuing such acts of unfair competition. AMS is also entitled to recover its costs and attorneys' fees.

76.    In performing the conduct described above, Lindsey acted despicably and with oppression, fraud or malice, intending to injure AMS and advantage himself wrongfully at AMS' expense.  By reason thereof, AMS is entitled to an award of punitive and exemplary damages in an amount to be ascertained at trial.

## **PRAYER FOR RELIEF ON COUNTERCLAIM**

WHEREFORE, AMS requests that judgment be entered against Counterdefendants, and each of them, as follows:

1.     That the Court enter judgment in favor of AMS and against Counterdefendants on all appropriate counts alleged herein;

2.     That the Court issue a temporary, preliminary, and thereafter, a permanent injunction against Counterdefendants, and each of them, and all others in active concert or participation with them with notice enjoining and restraining them from the following:

(a)     Producing, copying, disseminating, distributing, selling, offering for sale, or making any use whatsoever of AMS' trade secret information and TEN SMART IDEAS™ System materials;

(b)     Using the TEN SMART IDEAS™ trademark and the PROGRAMS TO PREMIUM™ trademark, or any other mark confusingly similar to those marks, in connection with the marketing or sale of services;

(c)     Engaging in any other activity constituting an infringement of: (i) AMS' copyrights to the TEN SMART IDEAS™ System material and all related training materials, manuals, and presentations, including the program invitation; (ii) AMS' rights to the TEN SMART IDEAS™ trademark and the PROGRAMS TO PREMIUM™ trademark; and (iii) AMS' right to use or to exploit the TEN SMART IDEAS™ program in the operation of AMS' business;

(d)     Using testimonials that were given by AMS' contracted agents who had participated in AMS' *Programs to Premium*™ training seminars, to market and promote Lindsey, Young, and/or their FMO, Revolution;

(e)     Soliciting AMS' contracted agents whom counterdefendants learned about through AMS and otherwise using AMS' trade secrets in competition with AMS to solicit AMS' agents;

3.     That the Court order Counterdefendants to pay AMS compensatory damages, according to proof at trial;

4.      That the Court order Counterdefendants to pay restitution of their profits from the above-described activities, according to proof at trial;

5.      That the Court order Counterdefendants to pay punitive and exemplary damages in an amount sufficient to punish and deter counterdefendants from engaging in such conduct in the future, according to proof at trial;

6.      That the Court order Counterdefendants to pay AMS' attorneys' fees under 17 U.S.C. § 505 and 15 U.S.C. § 117, as well as the agreement of the parties;

7.      That the Court order Counterdefendants to pay AMS' both the costs of the action and reasonable attorneys' fees incurred by AMS in prosecuting this action;

8.      For interest at the legal rate; and

9.      And for such other and further relief as the Court may deem just and proper.

DATED:  August 25, 2008                          HIGGS, FLETCHER & MACK LLP


By:  /s Phillip Samouris
_____
PHILLIP C. SAMOURIS, ESQ.
Attorneys for Defendant and
Counterclaimant
ASSET MARKETING SYSTEMS
INSURANCE SERVICES, LLC

This is to certify that a copy of the foregoing documents

**1.  ANSWER TO COMPLAINT BY DEFENDANT ASSET MARKETING SYSTEMS INSURANCE SERVICES, LLC AND COUNTERCLAIM**

were served on counsel for Plaintiffs and Counterdefendants, Revolution FMO, LLC, Mark Lindsey and Ty. J. Young by CM/ECF:

Wendy P. Harper, Esq.
Latham & Watkins LLP
633 West Fifth Street, Suite 4000
Los Angeles, CA  90071-2007
Wendy.Harper@lw.com

This is to further certify that a copy of the foregoing documents

**1.  ANSWER TO COMPLAINT BY DEFENDANT ASSET MARKETING SYSTEMS INSURANCE SERVICES, LLC AND COUNTERCLAIM**

were served on Counterdefendant, HENRY JOHN WIENIEWITZ III, a.k.a. TRAE WIENIEWITZ by US Mail, addressed as follows:

Mr. Henry John Wieniewitz, III
Wieniewitz Financial
9050 Executive Park Drive
Financial Plaza, Ste. 106A
Knoxville, TN  37923
Email: trae05@yahoo.com
Fax: 866-399-1872

DATED:  August 25, 2008                 By:   */s/ Phillip C. Samouris*
                                              PHILLIP C. SAMOURIS

Higgs, Fletcher
& Mack LLP
Attorneys At Law
San Diego

# EXHIBIT A

# *"PROGRAMS 2 PREMIUM"*

Presented by Mark Lindsey and Ty J. Young

REV 0001

## Structure for Success – NOW!

You're here for one reason – to increase your production. Some of you have even set goals to double your production. What if you reach those goals? Is your practice equipped to handle such an increase in volume?

You might say that you'll adapt your practice as the need presents itself. We're here to tell you that that's the wrong way to go. Don't take a reactive approach to the organizational structure of your business. Regardless of where your production currently stands, you should always be operating as if you're at the top of the Dream Team list.

***Programs 2 Premium*** will cover fundamentals of how to transform your operation into a fully functional entity that is primed to create and support a significant amount of growth and profitability.

REV 0002

# I.  Recruiting like a Champion: Teammate Selection

## a. REVOLUTION – Your Extended Office

As a licensed producer, you've selected REVOLUTION to be a part of your team. They are the only organization that provides you with total in-house product, sales and marketing support to further enable the growth of your business. Consider the REVOLUTION Consulting Model:

> **REVOLUTION**
> **Producer**

**Marketing Consultant..............................Business Consultant**

### The Role of the Business Consultant
It is the responsibility of your Business Consultant to provide you with total sales, product, and overall business support.  More than that, your Business Consultant serves as your coach, your mentor and your business partner.

### The Role of the Marketing Consultant
Your Marketing Consultant works with your Business Consultant to determine which marketing activities are most appropriate for your business.  They provide you with recommendations on how to attract new clients, maintain existing clients, and how to receive the highest return on the money you invest in marketing.

### The Role of the Producer
While your Business Consultant and Marketing Consultant are there to provide you with the coaching and resources needed to enhance the profitability and growth of your business, *the success of your business is ultimately up to you*.

REV 0003

## This is what a typical week looks like for Mark Lindsey



REV 0004

## b.    The Needs of your Practice

The best investment you can make in your business is to hire a competent staff. Don't put it off because you feel you don't have time, or because you can't afford it. The truth is you can't afford **_not_** to hire staff!

Review the following chart:

| Producer with Staff: | Without Staff: |
|---|---|
| On the phone 1/2 to 1 hour. | 3-7 Hours |
| Appt's per week - 20-25 | 3-5 |
| Paperwork - 1 hr | 5-8 hours |
| Office Misc. - 0-1/2 hr. | 10-15 hours |
| Production - $300,000.00 | $60,000.00 |
| Commission - $24,000.00 | $4,800.00 |

**REV 0005**

Quantify in percentages how you spend your time during a typical work week. For example: 10% paperwork, 50% client appointments, 10% setting appointments, etc...

_____

_____

_____

_____

_____

_____

_____

_____

_____

Now take the activities you listed above and quantify the amount of time you feel you *should* be devoting to each one.

_____

_____

_____

_____

_____

_____

_____

_____

_____

• Based on the above, do you feel your time is being spent as it should be?

_____

_____

_____

_____

_____

REV 0006

## c.        Time is Money

In sales, we frequently hear of the 80/20 rule: Spend 80% of your time selling, and 20% on other business related tasks, such catching up on paperwork, emails, etc...

We think you should be spending at least 90% of your time in front clients. If this is not the case, it is necessary that you re-evaluate your organizational structure.

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

REV 0007

REV 0008

### d.    Your Organizational Structure

The organizational structure for a seasoned producer's practice might look like this:



●**Role of the Appointment Setter/Relationship Coordinator**
A good appointment setter is critical to the success of your business. As a producer, it's likely that you make a significant investment to obtain new leads. An appointment setter's job is to turn those leads into appointments, ultimately playing a large role in increasing the profitability of your business.

●**Role of the Office Manager**
The Office Manager serves as your right hand, ensuring that your office is functioning smoothly and efficiently. This role is one that requires dedication, attention to detail, ability to create and follow office processes and ability to collaborate with other staff members to ensure follow-through on any given projects.

●**Role of the Policy Administrator**
The Policy Administrator is accountable for the effective coordination and accurate processing of client applications and files to the appropriate insurance carriers in a timely manner. This can be helpful to producers who spend most of their time in the field rather than in the office.

●**Role of the Administrative Assistant**
A good Administrative Assistant is helpful in providing general support to all office staff members and in performing administrative and clerical duties to assist the office manager.

REV 0010

**Suitability of Staff**

►In addition to employees that are trustworthy and capable, what kind of people do you want to represent your business and what you stand for?

_____

_____

_____

_____

_____

►What kind of person would be appropriate for each of the following roles?

- Appointment Setter/Relationship Coordinator

_____

_____

_____

_____

_____

- Office Manager

_____

_____

_____

- Policy Administrator

_____

_____

_____

- Administrative Assistant

_____

_____

**REV 0011**

REV 0012



## Managing your Staff

It's no secret that sales people would rather be closing sales than managing their staff. The effect on their practice can be disastrous! Remember that this is *your* business. If something goes wrong, *you* are accountable.

As the manager, it is **_your_** responsibility to:

- Communicate your expectations to each staff member
- Set goals for each staff member
- Ensure the most efficient processes are in place in your office.

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

REV 0013

Here are five suggested tips on how to keep your Appointment Setters/Relationship Coordinators and other staff members motivated:

1.    **Set Expectations** – Be clear on what you expect from each staff member.  Help them to establish goals.  For example, when working with your Appointment Setter/Relationship Coordinator, tell them how many appointments you want to see each week, what hours you expect them to work, etc...

_____

_____

2.    **Motivate, Don't Intimidate** – It is frustrating when business is not going the way you want it to, however, the best way to come to a resolution is to sit down with your staff member(s) and work together to achieve a viable solution.

_____

_____

3.    **Define Staff Roles** – Clearly define each role within your staff.  If everyone is clear on their own responsibilities, there is less room for mistakes. This alleviates a significant amount of stress in and around the office.

_____

_____

4.    **Communication is the Key** –   Learn how to communicate with each of your staff members, and let them know the best ways to communicate with you.  Hold meetings with each staff member once per month to discuss goals, happenings, etc...

_____

_____

5.    **Show Your Appreciation** – Take a personal interest in letting your staff know that you appreciate them.  When they feel appreciated, they are more motivated to do a good job.

_____

_____

**REV 0014**

**The Role of the Appointment Setter/Relationship Coordinator**

REV 0015

REV 0016

## II.  Preparing to Win:
## Workshop and Sales Preparation

REV 0017

## Getting in the Zone – Workshop Preparation

When preparing for your workshop presentation, keep the following points in mind:

**1.** ***Practice makes perfect***.  You've invested a significant amount of money and resources into making sure your workshop runs smoothly.  Do your part -learn your presentation BEFORE the workshop. DO NOT use the workshop as practice for your presentation.

_____

_____

_____

_____

_____

_____

_____

_____

**2.** ***You are NOT there to teach.***  Education comes after you make them clients.

_____

_____

_____

_____

_____

_____

_____

_____

**REV 0018**



**3.** *Stick to the script.* It is proven to be effective in its present form. If you become bored after many times of presenting the same script, remember that it's your audience's first time hearing it.

_____

_____

_____

_____

_____

_____

**4.** *Confidence is the Key.* Perception is everything! Don't appear nervous, even if that's the case.

_____

_____

_____

_____

_____

_____

_____

**5.** *Get appointments.* You are conducting this workshop for one reason – to get appointments and convert them into sales. Drive to them, and drive hard.

_____

_____

_____

_____

**REV 0019**

6. *Obtain referrals*.  If you get a referral from a workshop attendee, you've just doubled the return on your marketing investment.   Learn how to obtain referrals.

_____

_____

_____

_____

_____

_____

_____

_____

7. *Close Sales*.  The goal of the workshop is ultimately to close sales.  Control the leads you get from your workshops.  If they came to hear you speak, they have a financial need that you can fulfill.

_____

_____

_____

_____

_____

**REV 0020**

## The Relationship Coordinator/Appointment Setter and your Workshop

It is very important that you have an excellent working relationship with your Appointment Setter, especially when it comes to conducting workshops. Workshop attendees are not likely to respond favorably to a producer and Appointment Setter that clearly don't get along.  Consider the following points in order to enhance your working relationship with your Appointment Setter:

- Maintain a positive working relationship
- Rehearse workshops together on a consistent basis

---
---
---
---
---
---
---
---
---
---
---
---
---
---
---
---
---
---
---
---
---
---

REV 0021



## Sample Checklist

The following is a sample checklist a producer might use while preparing for a workshop. Each task should be designated accordingly to the producer, the Appointment Setter and any staff that might be helping with workshop logistics, set-up, etc.

**Day of the Program - Before leaving the office:**

___Confirm final number of attendees
___Prepare workshop packets for all attendees; make sure lead sheets are in each packet
___Prepare sign-in sheet
___Bring copies of referral cards
___Bring appointment book to set appointments on the spot
___Make sure staff members attending the workshop have a nametag
___Confirm workshop location will provide a sign-in table

**Arrive at workshop location one hour early. Upon arrival:**

___Inspect room in which you'll be holding your workshop
___Make sure any music that might be playing is turned OFF
___Make sure the lights are up, not dim
___Make sure tables are set up to your liking
___Be sure there is water available on each table for attendees
___Set up sign-in table
___Take final scan of the room
___Presenter should be outside greeting attendees
___Appointment Setter greeting people at sign-in table

**When presentation begins:**

___Close doors to room
___Appointment Setter remains outside for a period of time to receive late attendees
___Program presentation and conclusion
___Meal is served
___Appointment setting at program
___Stay and talk with attendees after program wraps

**REV 0022**



REV 0023

# III.  Performing Like a Champion: The Workshop

REV 0024

**The Ty Young Workshop:**
**The Mechanical Presentation**

During the course of the presentation, make a list of what you feel are the five (5)
most crucial points of the workshop.  Be prepared to discuss your thoughts.

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

REV 0025

REV 0026

**The Mark Lindsey Presentation:**
**The Charismatic Workshop**

During the course of the presentation, write down ways you think Mark's workshop differs from the presentation that Ty Young gave earlier. Be prepared to discuss with the class.

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

REV 0028

**Life Insurance**
**At the Workshop**

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

**Solutions**

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

REV 0029

# IV. Game Day:
# Sales and Closing Processes

REV 0030

### III.    Make Good on Promises

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

### IV.    Unlike Anyone you've Met with

_____

_____

_____

_____

_____

_____

_____

_____

_____

REV 0033

V.    Graphing the Page

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

VI.    Three things we must agree on

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

**REV 0034**

III.    Three things I do for all of my clients

_____

IV.    Review of Current Assets

_____

REV 0035

 # ASSET PROTECTION CONSULTANTS

## FINANCIAL PHYSICAL QUESTIONNAIRE

(Please fill in prior to your appointments.  Print Clearly.  It is OK to print approximate amounts.  Please have all statements available.)

### Date:_____

CLIENT NAME:_____

DATE OF BIRTH:_____AGE:_____RETIRED: YES ☐ NO ☐

SPOUSE NAME:_____

DATE OF BIRTH:_____AGE:_____RETIRED: YES ☐ NO ☐

MAILING ADDRESS:_____

CITY:_____STATE:_____ZIP:_____

HOME PHONE: (____)_____BUSINESS PHONE: (_____)_____

**Do you have a current will?** ☐ YES ☐ NO    **Living Trust?**    YES ☐ NO ☐
**Are you concerned about possible Nursing Home Expenses?** YES ☐ NO ☐

### AMOUNTS IN BANKS, SAVINGS & LOANS and CREDIT UNIONS (NON IRA)
(Checking, Savings, Money Market)

| | NAME OF INSTITUTION | TYPE OF ACCOUNT | MATURITY DATE | INTEREST RATE | APPROXIMATE BALANCE |
|---|---|---|---|---|---|
| 1. | _____ | _____ | _____ | _____ % | $ _____ |
| 2. | _____ | _____ | _____ | _____ % | $ _____ |
| 3. | _____ | _____ | _____ | _____ % | $ _____ |
| 4. | _____ | _____ | _____ | _____ % | $ _____ |

22736 Vanowen Street, Suite 300, West Hills, CA 91307 ◊ (800) 903-4247

**REV 0036**

## IRA ACCOUNTS AND OTHER <u>RETIREMENT</u> ACCOUNTS

| ACCOUNT TYPE&LOCATION (BANK, BROKER, EMPLOYER) | TYPE 401K, IRA | INTEREST RATE | APPROXIMATE MARKET VALUE |
|---|---|---|---|
| 1. _____ | _____ | _____ % | $ _____ |
| 2. _____ | _____ | _____ % | $ _____ |
| 3. _____ | _____ | _____ % | $ _____ |
| 4. _____ | _____ | _____ % | $ _____ |

## STOCKS AND BONDS (WHERE YOU HOLD CERTIFICATES YOURSELF)

| NAME OF STOCK/BOND | NUMBER OF SHARES | APPROXIMATE MARKET VALUE |
|---|---|---|
| 1. _____ | _____ | $ _____ |
| 2. _____ | _____ | $ _____ |
| 3. _____ | _____ | $ _____ |
| 4. _____ | _____ | $ _____ |

## MUTUAL FUNDS AND/OR BROKERAGE ACCOUNTS
### (Please have most recent reports/statements available)

| NAME OF BROKERAGE FIRM OR MUTUAL FUND | NUMBER OF SHARES | APPROXIMATE MARKET VALUE |
|---|---|---|
| 1. _____ | _____ | $ _____ |
| 2. _____ | _____ | $ _____ |
| 3. _____ | _____ | $ _____ |
| 4. _____ | _____ | $ _____ |
| 5. _____ | _____ | $ _____ |

**REV 0037**

## LIFE INSURANCE
(Please bring in policies and latest statements)

| | COMPANY | INSURED | TYPE OF INSURANCE (WHOLE LIFE, TERM) | DEATH BENEFIT |
|---|---|---|---|---|
| 1. | _____ | _____ | _____ | $ _____ |
| 2. | _____ | _____ | _____ | $ _____ |
| 3. | _____ | _____ | _____ | $ _____ |
| 4. | _____ | _____ | _____ | $ _____ |

## ANNUITIES
(Please bring in contracts and latest statements)

| | COMPANY | INTEREST RATE | APPROXIMATE VALUE | DATE PURCHASED |
|---|---|---|---|---|
| 1. | _____ | _____ % | $ _____ | _____ |
| 2. | _____ | _____ % | $ _____ | _____ |
| 3. | _____ | _____ % | $ _____ | _____ |
| 4. | _____ | _____ % | $ _____ | _____ |

## MONTHLY INCOME

1. $_____/YR   SOURCE:_____
2. $_____/YR   SOURCE:_____
3. $_____/YR   SOURCE:_____
4. $_____/YR   SOURCE:_____
5. $_____/YR   SOURCE:_____

REV 0038

## V.    Opening the Account



## VI.    Client Recommendations

REV 0041

**Sales and Closing Processes: Breakout Exercise**

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

**REV 0042**

# V. Performing Like a Champion: Building Client Relationships

REV 0043

**Retaining the Sale**

REV 0044

## Policy Delivery

The policy delivery is an essential part of doing business with a client. During the policy delivery, take care to review each detail of the account your client has just opened with you, and to answer any additional questions your client might have.

We strongly suggest you arrive at the policy delivery prepared with a comprehensive account folder containing no less than the following:

- Transfer History statement
- Contract Documents relevant to product just purchased
- Contract documents for all other open accounts
- Up to date account statements

REV 0045

## Maintaining Client Relationships

## Drip Marketing

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

**REV 0046**

## Client Appreciation Events

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

## Client Reviews

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

REV 0047

# The Silver Bullet

Keeping in mind all that we have reviewed over the course of this training, what would you consider to be the single most important thing, or "silver bullet," that will lead to an immediate increase the profitability of your practice?

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

**REV 0048**



**Client Referral Events**

REV 0049

# EXHIBIT B

## Confidential: P2P Boot Camp

## Agenda Day 1

8:00-8:15    Opening / Introduction
8:15- 9:00   Rules of Engagement

1) Questions only, no comments or experiences

a. Not that your comments and experiences aren't valuable, they are, but....

2) Role Playing Rules

a. Be true to the process word for word

b. Must stay in character

c. No sitting around, keep going

d. Never role play with the same person

3) Group breakout- must stay in character!

Racing, tell us if you're not going

**REV 0050**

9:00- 10:00   WELCOME TO BOOT CAMP

Getting Qualified Prospects

1. Page 10 – What Our Clients Want

2. Annuity Page

3. Blue Sheet

4. Setting Up Your Appointment Setter

    a. If you checked yes, there's someone I'd like to introduce to you…

    b. Set tonight, confirm tomorrow

    c. Caller ID Pick up the phone, call back

    d. Tell if I can help in 15 minutes

    e. Bring statements

    f. Be nice to Rachel

    g. Financial Organizer

- If you don't have a good relationship with your appointment setter, why do you expect clients to?

REV 0051



10:00- 10:15 Break

10:15-12:00  The Bridges – explanation

## MOST POWERFUL TOOL FROM LAST TRAININGS

- Pre Set Up
  - "I'm going to show you what I believe, I want to make sure we think alike"
  - "Three things we're going to have to agree on"
- Set Up
  - "Would you like for me to look at one particular account or the whole picture"
- Discovery
  - "What I'm going to do is show you what I would do if this were my money. If you like it, we'll go forward. If not, you're not going to hurt my feelings, fair enough?
- Transition
  - What I'm going to do is turn the page and show you the best choices, you tell me which one you like and we'll go from there

**REV 0052**



- o Do we have a winner here? Should I take care of the paperwork/ I'll run to the car and get the paperwork
- Close
  - o There's a number of things I want to make sure you have and are ready for during the process of moving your money
- Confirm Close
  - My clients are like my family, if there's anything I can do for you, let me know. There's a folder I want you to have

12:00-12:45  Lunch

Situational Suitability Drills – Break into groups
Financial Organizers

12:45- 1:15  **Set Up** - Review

1. Questions
2. Three things we'll have to agree on
3. Financial question marks
4. Break into Groups – Debbie & Rachel

**REV 0053**



**1:15- 2:15**   **Discovery**

    1. How do you feel about this account, agent

    2. Do you want this money safe

    3. Do you want to stop paying fees

    4. Are you comfortable with moving from this broker, company

    5. Break into Groups

**2:15- 2:45**   **Transition**

    1. Questions

    2. Catches

    3. Break into Groups – Debbie & Rachel

**2:45-3:00**   Break

**3:00-4:00**   **Close & Confirming the Close**

    Close

        1. Product Grid

    Confirm Close

        1. Preparing for broker's call

        2. Welcome to the Family folder

        3. Break into Groups – Debbie & Rachel

REV 0054



4:00- 5:00    Drilling Down – Handling Objections

- Assuming these objections come at the Close
- Get in groups, assign objections
- After groups, Ty & Mark's answer to objections- pass out worksheet


6:00    Racing - Top 25 invited
- look in name tag holder for invite
- Meet out front of hotel by 6:00 pm

REV 0055

## Confidential: P2P Boot Camp

## Agenda Day 2

9:00- 9:30    Opening / Re-Cap of Day One
- Getting qualified prospects
  - Page 10 , Blue Sheet, Annuity Page, Setting Up Your Appointment Setter
- The Bridges
- Situational Suitability  Drills
  - Sales process
- Handling Objections

9:30-10:30    Office Structure
1) Organizational Structure

2) Producer with Staff/ Without Staff
3) Marquee Employees
   a) Represent you well
   b) Take ownership
   c) Have a "whatever it takes" attitude
   d) Team player
   e) Problem solver

REV 0056



4) Once you have Marquee Employees, retain them
   a) If they are doing a good job, tell them and show them.
      i) Compensation
         1) Paid time off
         2) Flex hours
         3) Bonus
         4) Raise
      ii) Opportunity
         1) Responsibility
         2) Learn new skills
   b) Find positive things to say
   c) Let them know you love them
5) Interview Questions
   a) What are you doing now that you would like to be doing less of/ more of/ start doing/stop doing?
   b) What do you feel is your biggest Strength/weakness professionally?
6) Be a leader you would follow
   a) Be a good example
   b) 7 foot tall and bullet proof
   c) Be positive
   d) Always strive to get better
   e) Look for the good in every situation/opportunity
   f) Make it your mission to make a positive difference in everyone's life you touch
   g) Praise in public, correct in private

**REV 0057**

h) Let them know you appreciate them
i) If they are doing a good job, tell them
j) Find positive things to say
k) Let them know you love them

10:30- 11:30  Let's See What You Got!
Role play on Sales Process A to Z

- Randomly pick agent to come up and do everything we reviewed yesterday out of order
- Draw names out of hat

11:30 – 12:30   Lunch

12:30-1:15    Client Review – 10% Close

1. Move available 10% to shorter product
2. Who?
   a. Clients w/ longer contracts
   b. Clients w/ large surrender charges
3. What – more suitable investments for our clients

REV 0058

4. When- when you can improve a
   clients' financial situation
   a. Have 10% liquidity and don't need
      the money
5. Where
   a. ING 3 yr or 5 yr
   b. OM 4 yr or 6 yr
   c. Allianz 7 yr
6. Why
   a. More possible return (bonus on
      bonus)
   b. More liquidity (10 % from old and
      new contract next year)
   c. More  access to money more
      quickly
      (using a shorter contract)
7. How – " As a client there are 4 things
   I am always trying to do for you"
        i.  Safety of principal
        ii.  Maximum growth w/ safety
        iii.  Tax efficiency

REV 0059

      iv.  Reasonable Liquidity

     b. " There is a move I can make today that will increase your rate of return and give you more access to your money more quickly.  Would you like to hear more about that?"

| | |
|---|---|
| 1:15-2:00 | **Client Bring a Friend Night** |

    1. Same exact program- different setup

      - Example of setup

  a. Cost effective

  b. Great supplement to ordinary marketing

| | |
|---|---|
| 2:00-2:15 | **Client Appreciation Event** |

        What is your plan to get paid?

| | |
|---|---|
| 2:15- 2:30 | **Q & A** |

| | |
|---|---|
| 2:30 | Go Get 'em! |

**REV 0060**

# EXHIBIT C

## Programs to Premium™
Elite Special Operations Division
November 30 - December 1
San Diego, CA

# SPECIAL OPS

REV 0061



# Confidential: P2P Special Ops

Agenda Day 1

| | |
|---|---|
| 08:00 | Opening / Introduction |
| 08:15 | Mike Midlam |
| 08:45 | Personal Introductions |
| 09:15 | Break |
| 09:30 | Getting Qualified Prospects |
| 10:30 | The Bridges |
| 11:30 | Lunch |
| 12:30 | Set Up |
| 13:00 | Discovery |
| 13:30 | Transition |
| 14:30 | Break |
| 14:45 | Close & Confirming the Close |
| 15:45 | Drill Down - Handling Objections |
| 17:00 | Racing |

**REV 0062**

# Confidential: P2P Special Ops

Agenda Day 2

| | |
|---|---|
| 09:00 | Opening / Re-Cap of Day One |
| 09:30 | Let's See What You Got! |
| 10:30 | Client 10% Review |
| 10:45 | Client Bring a Friend Night |
| 11:00 | Client Appreciation Event |
| 11:15 | How to Get Paid Faster |
| 11:30 | Lunch |
| 12:30 | Stories From the Trenches |
| 13:00 | Business in A Box |
| 14:30 | Q & A |
| 15:00 | Go Get'em! |

REV 0063

# Getting Qualified Prospects

- What Our Clients Want (Page 10)
- Annuity Page
- Setting Up Your Appointment Setter

**REV 0064**

REV 0065



# The Bridges



_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

REV 0066

REV 0067



# Situational Suitability Drills:
## Set Up

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

REV 0068

REV 0069

# Situational Suitability Drills: Discovery

REV 0071

# Situational Suitability Drills: Transition

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

REV 0072



REV 0073

# Situational Suitability Drills:
## Close

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

REV 0074

REV 0075

# Situational Suitability Drills:
## Confirming the Close

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

**REV 0076**

REV 0077

# Handling Objections

*I'm not doing anything until I talk to my son*

*I want to think about it*

*I need to sleep on it*

*I'm going to wait until the market gets a little higher*

*I need to talk to my CPA*

*I'm going to wait until after the first of the year*

*You went through this awful fast, I'm a little confused*

*I need to pray about it*

*Can you run some numbers for me?*

*I'd like to look at a specimen contract*

*I want to see a brochure*

*I don't want to buy an annuity*

*I'd like a written proposal*

*I'd like to see a prospectus*

**REV 0078**

REV 0079

REV 0080

# Let's See What You Got

REV 0081

REV 0082

# Client 10% Review



REV 0083

REV 0084

# Client Bring A Friend Nights

REV 0086

# Client Appreciation Event

REV 0087

REV 0088

# How To Get Paid Faster

REV 0089

REV 0090

# Stories From The Trenches

REV 0091

REV 0092

# Business In A Box

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

**REV 0093**

REV 0094

REV 0095

REV 0097

**VII.   10% - 10% - 80%**

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____


**VIII.   Comments during Fact Finding**

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____


**REV 0098**

IX.    Review of Current Accounts

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

X.    Possible Accounts to Move

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

**REV 0099**

## XI.   Recommendations

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

## XII.   Product Choice

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

**REV 0100**

## XIII.   Closing

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

## XIV.   Completion of Paperwork

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

**REV 0101**

# "Think on your feet."

# The Mark Lindsey Sales Process

REV 0102

**The Mark Lindsey Process**

### I.    Small Talk

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

### II.    How I'm different

_____

_____

_____

_____

_____

_____

_____

_____

_____

REV 0103

# EXHIBIT D



# NONDISCLOSURE AGREEMENT

This Nondisclosure Agreement ("Agreement") is entered into effective as of _6/22_, 2006 by and between Asset Marketing Systems Insurance Services, LLC, a Delaware limited liability company ("AMS"), and Mark Lindsey ("Receiving Party"), with regard to the following:

A.    AMS and Receiving Party propose to collaborate for the purpose of providing sales and insurance product training to AMS' network of contracted insurance producers ("Business Purpose");

B.    AMS will by necessity and in connection with such collaboration, furnish to Receiving Party confidential information, which may include: financial statements, agent lists, producer lists, producers' production with AMS, technical and financial information, data, and plans, operations procedures, marketing plans, business methods; and other trade secrets as defined in Cal. Civ. Code sec. 3426.1, and other information all of which is proprietary and the property of AMS, the disclosure of which to the public or to actual or potential competitors, or the use of which by Receiving Party, would (i) violate the confidentiality rights of other persons and business organizations with which AMS does or may do business, and (ii) be severely detrimental to AMS (the "AMS Confidential Information" or "Confidential Information").

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.    AMS shall furnish certain Confidential Information whether in oral, digital, written or in any other form, to Receiving Party, and Receiving Party by accepting such AMS Confidential Information agrees to the following conditions:

1.1    To hold all AMS Confidential Information in trust and confidence and agrees that it shall be used only for the Business Purposes authorized by AMS, shall not be used for the benefit of Receiving Party or for any other purpose or disclosed to any third party;

1.2    Receiving Party shall not, or permit, to be made, without prior written consent of AMS, any copies or other reproductions of the Confidential Information.

1.3    Upon request by AMS, all AMS Confidential Information, and written notes, photographs, memoranda, or notes made or taken by Receiving Party shall be returned to AMS, and any AMS Confidential Information in electronic or digital form shall be destroyed or deleted from electronic devices, media, and computers;

1.4    Receiving Party shall not disclose AMS Confidential Information to any employee or consultant of Receiving Party unless they agree to execute and be bound by the terms of this Agreement;

1



1.5    Receiving Party shall take reasonable and necessary steps to protect the confidential nature of any and all financial information received from AMS and shall do so in accordance with all applicable laws and regulation relating to financial privacy.

1.6    Receiving Party shall not, directly or indirectly, in any way, reveal, report, publish, disclose, transfer or otherwise use any of the Confidential Information except as specifically authorized by AMS in accordance with this or any other written agreement between the parties.

2.    Receiving Party understands and acknowledges that any disclosure or misappropriation of Confidential Information provided to Receiving Party in violation of this Agreement may cause AMS irreparable harm and damage, the amount of which may difficult to ascertain, and therefore agrees that AMS may apply to and obtain from a court of competent jurisdiction, an order restraining any such further disclosure or misappropriation and for such other relief as AMS shall deem appropriate.  The rights of the parties described in this section shall be in addition to the remedies otherwise available at law or in equity.

3.    Receiving Party agrees that the list of agents, clients, and others with whom AMS does, or has done business with, is proprietary Confidential Information. During the term of this Agreement and for a period of five (5) years after termination, Receiving Party shall not (i) directly or indirectly solicit, divert or take away any agent of AMS for itself or on behalf of a competitor of AMS, or induce any agent or producer of AMS or its affiliates to discontinue its relationship with AMS; or (ii) directly or indirectly, solicit, induce, influence any agent, producer, or person employed by or under contract with AMS or its affiliates to terminate his or her employment, engagement or relationship with AMS.

4.    Receiving Party hereby agrees and acknowledges that no license, either express or implied, is hereby granted to Receiving Party by AMS to use any of the Confidential Information, except as otherwise contemplated by the terms of this Agreement.

5.    This Agreement shall commence on the date first written above. Receiving Party's right to use the Confidential Information in connection with the Business Purposes shall continue in effect until either party provides the other party with written notice of termination.  Notwithstanding the foregoing, a Receiving Party's obligations with respect to the Confidential Information hereunder shall continue in full force and effect until further notice from AMS, and shall extend beyond the termination of this agreement.

6.    Should any dispute including, but not limited to, litigation, be commenced between AMS and Receiving Party concerning any provision of this Agreement or the rights and duties of any person or entity hereunder, the prevailing party in such dispute or litigation shall be entitled, in addition to such other relief as may be granted, to the attorneys' fees and costs incurred by the prevailing party by reason of such dispute or litigation.

2

 

7.      This Agreement shall be governed by the laws of the State of California, except to the extent superseded, if at all, by United States Federal Law. Any dispute regarding this Agreement shall only be heard and resolved in a federal or state court of competent jurisdiction located in the County of San Diego, California. Receiving Party and AMS each hereby irrevocably gives its consent to the personal jurisdiction of such court.

8.      Receiving Party agrees to defend and indemnify AMS against any and all losses, damages, claims, or expenses incurred or suffered by AMS as a result of Receiving Party's breach of this Agreement.

9.      No delay or omission in the exercise of any power, remedy, or right of a party impairs or affects the right of that party to exercise it. Any extension of time or other indulgence granted to a party does not alter or affect any power, remedy, or right of any other party, or any obligation of the party to whom such extension or indulgence is granted, except as specifically provided.

10.     If any portion of this Agreement is held by a tribunal of competent jurisdiction to be unenforceable, the remaining provisions remain enforceable to the fullest extent permitted by law if enforcement would not frustrate the overall intent of the parties (as intent is manifested by all provisions of the Agreement, including the unenforceable portion).

11.     This Agreement may be signed in counterparts with the same force and effect as if all original signatures appeared on one copy; and in the event signed in counterparts, each counterpart is the equivalent of an original and all of the counterparts are the equivalent of one agreement.

12.     Facsimile signatures on this Agreement, notices, and amendments are the equivalent of original signatures.

13.     This Agreement is the sole understanding of the parties about this subject matter and may not be modified except by a writing signed by each of the parties to this Agreement.


**Asset Marketing Systems Insurance Services, LLC**

By: _____
      Jay Akerstein, COO

**Receiving Party**

By: _____
      Mark Lindsey


3

# EXHIBIT E



# NONDISCLOSURE AGREEMENT

This Nondisclosure Agreement ("Agreement") is entered into effective as of _06/22/06_ 2006 by and between Asset Marketing Systems Insurance Services, LLC, a Delaware limited liability company ("AMS"), and Ty Young ("Receiving Party"), with regard to the following:

     **A.**    AMS and Receiving Party propose to collaborate for the purpose of providing sales and insurance product training to AMS' network of contracted insurance producers ("Business Purpose");

     **B.**   AMS will by necessity and in connection with such collaboration, furnish to Receiving Party confidential information, which may include: financial statements, agent lists, producer lists, producers' production with AMS, technical and financial information, data, and plans, operations procedures, marketing plans, business methods; and other trade secrets as defined in Cal. Civ. Code sec. 3426.1, and other information all of which is proprietary and the property of AMS, the disclosure of which to the public or to actual or potential competitors, or the use of which by Receiving Party, would (i) violate the confidentiality rights of other persons and business organizations with which AMS does or may do business, and (ii) be severely detrimental to AMS (the "AMS Confidential Information" or "Confidential Information").

     NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

     1.    AMS shall furnish certain Confidential Information whether in oral, digital, written or in any other form, to Receiving Party, and Receiving Party by accepting such AMS Confidential Information agrees to the following conditions:

          1.1    To hold all AMS Confidential Information in trust and confidence and agrees that it shall be used only for the Business Purposes authorized by AMS, shall not be used for the benefit of Receiving Party or for any other purpose or disclosed to any third party;

          1.2    Receiving Party shall not, or permit, to be made, without prior written consent of AMS, any copies or other reproductions of the Confidential Information.

          1.3    Upon request by AMS, all AMS Confidential Information, and written notes, photographs, memoranda, or notes made or taken by Receiving Party shall be returned to AMS, and any AMS Confidential Information in electronic or digital form shall be destroyed or deleted from electronic devices, media, and computers;

          1.4    Receiving Party shall not disclose AMS Confidential Information to any employee or consultant of Receiving Party unless they agree to execute and be bound by the terms of this Agreement;

1

 

1.5     Receiving Party shall take reasonable and necessary steps to protect the confidential nature of any and all financial information received from AMS and shall do so in accordance with all applicable laws and regulation relating to financial privacy.

1.6     Receiving Party shall not, directly or indirectly, in any way, reveal, report, publish, disclose, transfer or otherwise use any of the Confidential Information except as specifically authorized by AMS in accordance with this or any other written agreement between the parties.

2.      Receiving Party understands and acknowledges that any disclosure or misappropriation of Confidential Information provided to Receiving Party in violation of this Agreement may cause AMS irreparable harm and damage, the amount of which may difficult to ascertain, and therefore agrees that AMS may apply to and obtain from a court of competent jurisdiction, an order restraining any such further disclosure or misappropriation and for such other relief as AMS shall deem appropriate. The rights of the parties described in this section shall be in addition to the remedies otherwise available at law or in equity.

3.      Receiving Party agrees that the list of agents, clients, and others with whom AMS does, or has done business with, is proprietary Confidential Information. During the term of this Agreement and for a period of five (5) years after termination, Receiving Party shall not (i) directly or indirectly solicit, divert or take away any agent of AMS for itself or on behalf of a competitor of AMS, or induce any agent or producer of AMS or its affiliates to discontinue its relationship with AMS; or (ii) directly or indirectly, solicit, induce, influence any agent, producer, or person employed by or under contract with AMS or its affiliates to terminate his or her employment, engagement or relationship with AMS.

4.      Receiving Party hereby agrees and acknowledges that no license, either express or implied, is hereby granted to Receiving Party by AMS to use any of the Confidential Information, except as otherwise contemplated by the terms of this Agreement.

5.      This Agreement shall commence on the date first written above. Receiving Party's right to use the Confidential Information in connection with the Business Purposes shall continue in effect until either party provides the other party with written notice of termination. Notwithstanding the foregoing, a Receiving Party's obligations with respect to the Confidential Information hereunder shall continue in full force and effect until further notice from AMS, and shall extend beyond the termination of this agreement.

6.      Should any dispute including, but not limited to, litigation, be commenced between AMS and Receiving Party concerning any provision of this Agreement or the rights and duties of any person or entity hereunder, the prevailing party in such dispute or litigation shall be entitled, in addition to such other relief as may be granted, to the attorneys' fees and costs incurred by the prevailing party by reason of such dispute or litigation.

2

7.    This Agreement shall be governed by the laws of the State of California, except to the extent superseded, if at all, by United States Federal Law. Any dispute regarding this Agreement shall only be heard and resolved in a federal or state court of competent jurisdiction located in the County of San Diego, California. Receiving Party and AMS each hereby irrevocably gives its consent to the personal jurisdiction of such court.

8.    Receiving Party agrees to defend and indemnify AMS against any and all losses, damages, claims, or expenses incurred or suffered by AMS as a result of Receiving Party's breach of this Agreement.

9.    No delay or omission in the exercise of any power, remedy, or right of a party impairs or affects the right of that party to exercise it. Any extension of time or other indulgence granted to a party does not alter or affect any power, remedy, or right of any other party, or any obligation of the party to whom such extension or indulgence is granted, except as specifically provided.

10.    If any portion of this Agreement is held by a tribunal of competent jurisdiction to be unenforceable, the remaining provisions remain enforceable to the fullest extent permitted by law if enforcement would not frustrate the overall intent of the parties (as intent is manifested by all provisions of the Agreement, including the unenforceable portion).

11.    This Agreement may be signed in counterparts with the same force and effect as if all original signatures appeared on one copy; and in the event signed in counterparts, each counterpart is the equivalent of an original and all of the counterparts are the equivalent of one agreement.

12.    Facsimile signatures on this Agreement, notices, and amendments are the equivalent of original signatures.

13.    This Agreement is the sole understanding of the parties about this subject matter and may not be modified except by a writing signed by each of the parties to this Agreement.

**Asset Marketing Systems Insurance Services, LLC**

By: _____
Jay Akerstein, COO

**Receiving Party**

By: _____
Ty Young

3

# EXHIBIT F

Int. Cls.: 9, 16, 35, 36, and 41

Prior U.S. Cls.: 2, 5, 21, 22, 23, 26, 29, 36, 37, 38, 50, 100, 101, 102, and 107

**Reg. No. 3,436,876**

## United States Patent and Trademark Office

Registered May 27, 2008

### TRADEMARK
### SERVICE MARK
#### PRINCIPAL REGISTER

## PROGRAMS TO PREMIUM

ASSET MARKETING SYSTEMS INSURANCE SERVICES, LLC (DELAWARE LTD LIAB CO)
9715 BUSINESSPARK AVENUE
SAN DIEGO, CA 92131

FOR: PRE-RECORDED AUDIO AND VIDEO TAPES, CDS AND DVDS FEATURING CLASSES, WORKSHOPS, SEMINARS AND CONFERENCES IN THE FIELDS OF FINANCIAL PLANNING AND FINANCIAL PRODUCTS, IN CLASS 9 (U.S. CLS. 21, 23, 26, 36 AND 38).

FIRST USE 9-1-2006; IN COMMERCE 9-1-2006.

FOR: PRINTED TRAINING AND EDUCATIONAL MATERIALS, NAMELY, INFORMATIONAL LETTERS, HANDBOOKS, PERSONAL ORGANIZERS, GUIDES, MANUALS, BROCHURES, HANDOUTS, QUESTIONNAIRES AND FORMS IN THE FIELDS OF FINANCIAL PLANNING AND FINANCIAL PRODUCTS, IN CLASS 16 (U.S. CLS. 2, 5, 22, 23, 29, 37, 38 AND 50).

FIRST USE 9-1-2006; IN COMMERCE 9-1-2006.

FOR: DIRECT MAIL ADVERTISING SERVICES; PROVIDING DIRECT E-MAIL ADVERTISING SERVICES, PRODUCTION AND PLACEMENT OF PRINT, RADIO AND TELEVISION ADVERTISING FOR OTHERS, AND BUSINESS MANAGEMENT SERVICES IN THE FIELDS OF FINANCIAL PLAN-

NING AND FINANCIAL PRODUCTS, IN CLASS 35 (U.S. CLS. 100, 101 AND 102).

FIRST USE 9-1-2006; IN COMMERCE 9-1-2006.

FOR: PROVIDING FINANCIAL INFORMATION IN THE NATURE OF INVESTMENTS, FINANCIAL ANALYSIS AND CONSULTATION , IN CLASS 36 (U.S. CLS. 100, 101 AND 102).

FIRST USE 9-1-2006; IN COMMERCE 9-1-2006.

FOR: EDUCATIONAL SERVICES, NAMELY, PROVIDING CLASSES, WORKSHOPS, SEMINARS, AND CONFERENCES, IN THE FIELDS OF FINANCIAL PLANNING AND FINANCIAL PRODUCTS, IN CLASS 41 (U.S. CLS. 100, 101 AND 107).

FIRST USE 9-1-2006; IN COMMERCE 9-1-2006.

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT, STYLE, SIZE, OR COLOR.

NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "PROGRAMS", APART FROM THE MARK AS SHOWN.

SN 77-049,237, FILED 11-21-2006.

KATHY DE JONGE, EXAMINING ATTORNEY

# EXHIBIT G

# AGENT NONDISCLOSURE AGREEMENT

This NONDISCLOSURE AGREEMENT ("Agreement") is entered into effective as of July 22, 2005, by and between ASSET MARKETING SYSTEMS INSURANCE SERVICES, LLC, a Delaware limited liability company ("AMS") and, Henry John Wieniewitz III, ("Receiving Party").

## RECITALS

A.    AMS possesses certain confidential proprietary information.

B.    In connection with the pursuit, evaluation and/or feasibility of a business relationship, and/or the consummation of a transaction between Receiving Party and AMS (collectively, the "Business Purposes"), confidential proprietary information of AMS may become available to Receiving Party.

C.    AMS desires to prevent unauthorized use and disclosure of its confidential proprietary information.

IN CONSIDERATION of these premises and in exchange for other good and valuable consideration, receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

## AGREEMENT

1. **Confidential Information.** For purposes of this Agreement, Confidential Information shall mean all agent and client lists or other lists of company's with which AMS does business, presentation and telemarketing scripts, direct mail pieces, confirmation fliers, newspaper inserts, and related layouts, designs, and concepts, as well as all instructional manuals and handouts, teaching tools and techniques, policies and procedures, information relating to processes, technologies or theory of AMS, or its employees, clients and agents, and of any other corporation or entity that may be a party to a particular transaction with AMS, and all other information which may be disclosed by AMS or to which Receiving Party may be provided access by AMS or by others on behalf of AMS and in accordance with this Agreement or prior to this agreement, or which is generated as a result of or in connection with the Business Purposes, which are not matters of public knowledge or of general knowledge.

2. **Nondisclosure Obligations.** Receiving Party promises and agrees to receive and hold the Confidential Information in confidence. Without limiting the generality of the foregoing, Receiving Party further promises and agrees:

a) to protect and safeguard the Confidential Information against unauthorized use, publication or disclosure;

LIC-002
Revised 12/16/04
428627.4

b) not to, directly or indirectly, in any way, reveal, report, publish, disclose, transfer or otherwise use any of the Confidential Information except as specifically authorized by AMS in accordance with this or any other written agreement between AMS and the Receiving Party;

c) not to use any Confidential Information in any manner except in connection with the Business Purposes;

d) to restrict access to the Confidential Information to those of its officers, directors, and employees who need such access to evaluate or carry out the Business Purposes; and

e) to advise each of the persons to whom it provides access to any of the Confidential Information, that such persons are strictly prohibited from any disclosure or use not authorized by this Agreement or otherwise in writing by AMS. The Receiving Party shall be responsible for any unauthorized use of disclosure of the Confidential Information by those to whom it discloses the Confidential Information.

3. **Exceptions.** The confidentiality obligations hereunder shall not apply to Confidential Information which:

a) is, or later becomes, public knowledge or general knowledge other than by the Receiving Party's breach of the provisions of this Agreement;

b) is in the possession of Receiving Party prior to its receipt from AMS, with no restrictions upon the right to disclose the information imposed by a third party;

c) is properly received by Receiving Party from a third party, with no restrictions on disclosure;

d) is shown to have been independently developed by the Receiving Party, without reference to the Confidential Information; or

e) is required to be disclosed under the order of a court or other governmental authority.

4. **Return of Confidential Information.** Receiving Party agrees, upon termination of the Business Purpose or upon the written request of AMS, whichever is earlier, to promptly return to AMS all records, notes, and other written, printed, electronic, or tangible materials supplied by AMS and in the possession of Receiving Party; and to destroy all copies or other derivative information embodying all or any part of the Confidential Information.

5. **No Solicitation of Agents or Others.** Receiving Party agrees that the list of agents, clients, and others with whom AMS does or has done business is proprietary Confidential Information, and agrees not to improperly solicit any of them for any purpose in which AMS has a legitimate business interest.



6. **No Right to Confidential Information.**

a)   Receiving Party hereby agrees and acknowledges that no license, either express or implied, is hereby granted to Receiving Party by AMS to use any of the Confidential Information, except as otherwise contemplated by the terms of this or any other written agreement between AMS and the receiving party.

b)   Receiving Party agrees that all inventions, improvements, designs, trademarks, copyrightable works, relating to machines, methods, compositions, products or services of AMS directly resulting from or relating to the Confidential Information, in which AMS has a legitimate business interest, and the right to market, use, license and franchise said Confidential Information or the ideas, concepts, methods or practices embodied therein shall be the exclusive property of AMS, and Receiving Party has no right or title thereto.

c)   Except as specifically provided in a separate License Agreement or as necessary to carry out the Business Purposes, Receiving Party further agrees that it will not make or permit to be made, without prior written consent of AMS, any copies or other reproductions of the Confidential Information or copyrighted / copyrightable materials that AMS may supply to Receiving Party hereunder.

7. **No Solicitation or Hiring of Employees.**  Receiving Party agrees that it will not, for a period of five (5) years from the date of this Agreement, knowingly hire or initiate contact with AMS employees in order to improperly solicit, entice or induce any employee of AMS to terminate an employment relationship with AMS to accept employment with Receiving Party.

8. **Losses.**  Receiving Party agrees to indemnify and defend AMS against any and all losses, damages, and claims, incurred or suffered by AMS as a result of Receiving Party's unauthorized use or disclosure of the Confidential Information in breach of this Agreement.

9. **Term and Termination.**  This Agreement shall commence on the date first written above. Receiving Party's right to use the Confidential Information in connection with the Business Purposes shall continue in effect until either party provides the other party with written notice of termination.  Notwithstanding the foregoing, Receiving Party's obligations with respect to the Confidential Information hereunder shall continue in full force and effect until further notice from AMS, and shall extend beyond the termination of this agreement.

10. **Remedies.**  Receiving Party understands and acknowledges that any unauthorized use disclosure or misappropriation of any of the Confidential Information in breach of this Agreement may cause AMS irreparable harm, the amount of which may be difficult to ascertain and, therefore, agrees that AMS shall have the right to apply to a court of competent jurisdiction for an order restraining any such further disclosure or misappropriation and for such other relief as AMS shall deem appropriate. Such right of Disclosing Party shall be in addition to Remedies otherwise available to AMS at law or in equity.

11. **Successors and Assigns.**  Receiving Party shall have no right to assign its rights under this Agreement, whether expressly or by operation of law, without the written consent of AMS, and except as contemplated by any other written agreement for products and services that may be

executed between them. This Agreement and Receiving Party's obligations hereunder shall be binding on representatives, permitted assigns, and successors of Receiving Party and shall inure to the benefit of representatives, assigns and successors of AMS.

12. **Governing Law.** This Agreement shall be governed by and construed in accordance with the laws of the State of California.

13. **Entire Agreement.** This Agreement constitutes the sole understanding of the parties about this subject matter and may not be amended or modified except in writing signed by each of the parties to the Agreement.

14. **Dispute Resolution and Forum Selection.** Any dispute regarding this Agreement shall only be heard and resolved in a federal or state court of competent jurisdiction located in the County of San Diego, California. Receiving Party and AMS each hereby irrevocably gives its consent to the personal jurisdiction of such court. **The parties also hereby waive the right to trial by a jury and agree that any matter shall be submitted to the court for adjudication without a jury. The parties understand that they have a right to trial by jury and that by signing this agreement they waive that right.**

15. **Counterparts.** This Agreement may be signed in counterparts with the same force and effect as if all original signatures appeared on one copy, and in the event this Agreement is signed in counterparts, each counterpart shall be the equivalent of an original and all of the counterparts shall be the equivalent of one Agreement.

16. **Facsimile Signatures.** Facsimile signatures contain herein and on other notices and amendments shall be the equivalent of original signatures.

17. **Severability.** If any provision(s) of this Agreement is or are rendered by a court or governmental agency of competent jurisdiction to be invalid, illegal, or unenforceable, such provision(s) invalidity, illegality, or unenforceability shall not affect the remainder of this Agreement which shall remain in full force and effect and shall be enforced in accordance with its remaining terms.

      IN WITNESS WHEREOF, the parties have executed this Agreement effective as of the date above.

**RECEIVING PARTY**

**ASSET MARKETING SYSTEMS, INSURANCE SERVICES, LLC, a Delaware limited liability company**

By: _____
Henry John Wieniewitz III

By: _____
     Michael Midlam, CEO